672 F.2d 407
 UNITED STATES of America, Plaintiff-Appellee,
v.
Anthony Wentworth BETHEA, Kenneth Jerome Bragg,
Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kenneth Jerome BRAGG, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Roy Carson FUGATE, Defendant-Appellant.
 Nos. 80-7651, 80-7756 and 80-7841.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 March 17, 1982.
 Faulk & Landreau, Bob Faulk, Phenix City, Ala., Hornsby & Schmitt, A Professional Corp., Ernest C. Hornsby, Tallahassee, Ala., for Bragg.
 David B. Byrne, Jr., Montgomery, Ala. (Court-appointed), for Bethea.
 D. Broward Segrest, 1st Asst. U. S. Atty., Charles R. Niven, Asst. U. S. Atty., Montgomery, Ala., for plaintiff-appellee.
 Appeals from the United States District Court for the Middle District of Alabama.
 Before MORGAN, TJOFLAT and ANDERSON, Circuit Judges.
 R. LANIER ANDERSON, III, Circuit Judge:
 
 
 1
 These consolidated appeals arise out of the prosecution of five persons under the Mail Fraud and Racketeering Influenced Corrupt Organization ("RICO") Acts and related forfeiture proceedings. Appellants Kenneth Jerome Bragg ("Bragg"), Anthony Wentworth Bethea ("Bethea"), Roy Carson Fugate ("Fugate") and two others were each charged in a seven-count indictment, including five counts of mail fraud under 18 U.S.C.A. § 1341 (West Supp.1981), one count alleging violation of the substantive racketeering provision of RICO, 18 U.S.C.A. § 1962(c) (West Supp.1981), and one count of conspiracy to violate RICO, under 18 U.S.C.A. § 1962(d) (West Supp.1981). After a trial of almost three weeks, a jury convicted Bragg on all counts, convicted Bethea on both RICO counts and on two counts of mail fraud, and acquitted Fugate and the two other defendants on all counts. The district judge fined Bragg a total of $50,000, sentenced him to six years imprisonment on each of the RICO counts and to five years imprisonment on each of the mail fraud counts, all to run concurrently, and ordered forfeiture of Bragg's interest in Delcher Moving and Storage, Inc. and in the Howe Richardson Truck Scales, located at the Torch 280 Truck Stop. Bethea was sentenced to concurrent three-year terms on each of the four counts under which he was convicted, with all but four months of these sentences suspended in lieu of three years probation. Both Bragg and Bethea appeal from their convictions, raising a myriad of arguments for reversal. Bragg and Fugate appeal separately from the denial of their motions for indemnification-from the assets of the forfeited Delcher Moving and Storage, Inc.-of their legal expenses incurred in connection with this prosecution. We have carefully reviewed the twenty-two volumes of the record in this case and conclude that there is insufficient evidence to support the convictions of Bethea, and therefore they are reversed. Bragg's convictions must fall as well because of insufficient evidence and other reasons set forth below. In view of this disposition of the case, the separate appeals of Bragg and Fugate are dismissed as moot.
 
 I. FACTS
 
 2
 Although the facts are set out in greater detail in our discussion of the sufficiency of the evidence, a few words of introduction are necessary. An indictment was returned by a federal grand jury in the Middle District of Alabama, on February 21, 1980, charging Bragg, Bethea, Fugate and two others on the mail fraud and RICO counts described above. Bragg is the owner and president of Delcher Moving and Storage, Inc. ("Delcher"), a company which was qualified to provide moving and storage services for the Department of Defense at Fort Benning, Georgia. Bethea was the chief of the Household Goods Section of the Transportation Office at Fort Benning. Fugate was the operations manager at Delcher. The two other defendants were a secretary at Delcher and the operator of a truck stop whose truck scales were used by Delcher to weigh its trucks.
 
 
 3
 The allegations in the mail fraud counts of the indictment charged that the defendants had engaged in a scheme to defraud the government by overcharging in cases where Delcher handled the moving and storage needs of armed service members. The devices allegedly employed in this scheme included charging for storage-in-transit at origin ("SITO") where the service member had not requested it, inflating weights on which charges for moving and storage were based, charging for accessorial services not performed, and charging for packing materials not utilized. Bethea's participation in the alleged scheme was limited to the authorization of SITO.
 
 
 4
 The use of storage-in-transit is often necessary when the goods of service members are moved to a new duty station. After a service member receives orders to report to a different facility, the member applies at the transportation office at his present duty station for shipment and/or storage of his goods. At that time, the service member meets with a transportation counselor who assigns the member a pack-up date, a pick-up date and a delivery date for his goods. Moving companies generally have a period of several days, known as "transit time," during which they may deliver the service member's goods to his new address. Depending upon the needs of the member, storage-in-transit may be authorized at origin ("SITO") or at destination ("SITD") in order to insure that the goods are picked up and delivered at the requested times. Each service member is entitled to ninety days of storage-in-transit in connection with permanent changes of duty stations.
 
 
 5
 Generally, SITO is authorized at the request of a member. A Certified Transportation Agent ("CTA") must approve the use of SITO, by determining whether SITO would be in the "best interests of the member and the Government."[1] As the chief of the Household Goods Section, Bethea was the immediate supervisor of the CTAs. In this official capacity, Bethea was in a position to authorize or facilitate the authorization of the use of SITO in connection with moves of service members. The indictment alleged that Bethea and Bragg, as part of the scheme to defraud, caused SITO to be authorized without the knowledge or request of the service member and therefore contrary to Department of Defense Regulations. The mailings alleged in the mail fraud counts, Counts III-VII, related only to alleged improper authorization of SITO. There is no evidence that the moves to which these mailings pertain were infected with any of the other alleged irregularities listed as devices to defraud in the indictment.
 
 
 6
 The RICO counts of the indictment, Counts I and II, charged the defendants with conspiracy to participate in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C.A. § 1962(d) (West Supp.1981), and actual participation in the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c) (West Supp.1981). In sum, the indictment alleged that all defendants had conspired to and had participated, directly or indirectly, in the conduct of the affairs of Delcher Moving and Storage, Inc. through a pattern of mail fraud. Listed as overt acts under Count I were specific incidents of alleged overcharges with respect to moving and storage services which Delcher provided for the government between January 1, 1967 and February 21, 1980, the date of the indictment. In Count II, the overt acts consisted of mailings which related to certain alleged overcharges made by Delcher. The alleged mailings which occurred before February 21, 1975, related to moves in which the full range of alleged devices to defraud the government were present; the five mailings that occurred after February 21, 1975, were the same mailings alleged in the individual counts of mail fraud, Counts III-VII, and related only to incidents involving SITO.
 
 II. SUFFICIENCY OF THE EVIDENCE-MAIL FRAUD
 
 7
 The essential elements of a violation of the mail fraud statute, 18 U.S.C.A. § 1341 (West Supp.1981),[2] were recently set forth in United States v. Goss, 650 F.2d 1336 (5th Cir. 1981). There, we stated:
 
 
 8
 To establish a mail fraud violation, the government must prove the existence of a scheme to defraud that involved use of the mails for the purpose of executing the scheme. The evidence must demonstrate the defendant's specific intent to commit fraud.
 
 
 9
 Id. at 1341 (citing United States v. Freeman, 619 F.2d 1112, 1117 (5th Cir. 1980), cert. denied, 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981); United States v. Zicree, 605 F.2d 1381, 1384 (5th Cir. 1979), cert. denied, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980); United States v. Kent, 608 F.2d 542, 545 n.3 (5th Cir. 1979), cert. denied, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980)). Appellants Bragg and Bethea argue that the evidence adduced at trial was insufficient to establish that the authorization of SITO was part of a scheme to defraud and insufficient to prove that the defendants had the requisite specific intent to defraud. We now turn to a review of the sufficiency of the proof offered by the government.
 
 
 10
 The standard for appellate review of criminal convictions for sufficiency of the evidence is well established. This court
 
 
 11
 must view the evidence, direct or circumstantial, in the light most favorable to the government and must accept all reasonable inferences and credibility choices that tend to support the jury's verdict. The standard of review is whether a jury could reasonably find that the evidence is inconsistent with every reasonable hypothesis of innocence or, put another way, whether a reasonably-minded jury must necessarily entertain a reasonable doubt of the defendant's guilt.
 
 
 12
 United States v. Marx, 635 F.2d 436, 438 (5th Cir. 1981), quoted in United States v. Glasgow, 658 F.2d 1036, 1040 (5th Cir. 1981) (citations omitted). For a conviction to stand, it must be supported by substantial evidence. United States v. Goss, 650 F.2d at 1343 n.3, United States v. Ferg, 504 F.2d 914, 916 (5th Cir. 1974).
 
 
 13
 Viewed in the light most favorable to the government, the evidence supporting the conclusion that Bethea and Bragg knowingly participated in a scheme to defraud the government is as follows:
 
 
 14
 1. The governing Department of Defense regulations contemplate, and the practice at the Fort Benning, Georgia, transportation office normally called for, the service member whose goods were being moved to request storage-in-transit at origin (SITO) before SITO would normally be authorized.
 
 
 15
 2. The regulations contemplate, and the general custom and practice at Fort Benning reflected, a preference for storage-in-transit at destination (SITD) when it was necessary to place goods in temporary storage.
 
 
 16
 3. Delcher Moving and Storage, Inc. received more SITO than did other carriers doing business with the Fort Benning Transportation Office, especially during the period of June-August, 1974.
 
 
 17
 4. From time to time, Bragg's secretary brought in government bills of lading (GBL's) to the transportation office at Fort Benning, as was common practice, in order that changes could be made to reflect that Delcher was providing different service than the GBL reflected. Stapled to these GBL's were handwritten notes to the effect that Mr. Bethea had authorized a given number of days of SITO.
 
 
 18
 5. SITO would be authorized in cases involving Delcher by a certified transportation agent (CTA) at Fort Benning, either on the authority of these notes or after consultation with Mr. Bethea, or Mr. Bethea would personally authorize SITO.
 
 
 19
 6. Of the service member transportation files introduced into evidence, most of the files with respect to which Delcher had been paid for SITO did not contain a Fort Benning Form 48, government telegram (TWIX) or other documentation of a request by a service member for SITO or other justification for its authorization.
 
 
 20
 7. Many service members testified that they had not personally requested SITO in connection with the shipment of their goods where charges for SITO had been paid to Delcher.
 
 
 21
 8. In one file, a certain service member's goods had been ordered out of nontemporary storage, which was at the service member's expense, to SITO at Delcher, which was at the government's expense. That file contained a handwritten note from Bethea instructing a secretary to call Ft. Reily, Kansas, about charges for storage, stating that "a letter wouldn't be too wise in a crooked deal like this."
 
 
 22
 9. In March 1971, Bragg co-signed a loan of $6,000 for Bethea, who would not have received the loan without such a co-signature. Bethea gave Bragg a second mortgage on Bethea's home in the amount of $6,000 in the same month. This transaction was contrary to Army conflict-of-interest regulations.
 
 
 23
 10. Bethea was delinquent in repaying his loan on approximately 12 occasions. In three such cases, the bank contacted Bragg to inform him of the delinquency. Payment was thereafter received in each case, although there is no evidence that Bragg made any of the payments, and the loan was fully repaid.
 
 
 24
 The inferences that the government would have us draw from this evidence are as follows:
 
 
 25
 1. The notes were a signal to Bethea to authorize SITO for Delcher or a manifestation of communication between the two that SITO should be authorized despite the lack of need for it.
 
 
 26
 2. The lack of documentation in the files indicates that there was no legitimate reason for authorizing SITO.
 
 
 27
 3. The greater frequency of SITO's for Delcher indicates that SITO was being improperly authorized for Delcher's benefit.
 
 
 28
 4. Endorsement of the bank loan was a payment to Bethea in return for his cooperation in funnelling unnecessary SITO's to Delcher.
 
 
 29
 5. The security deed reflects a separate loan from Bragg to Bethea and not security for the endorsement of the bank loan.
 
 
 30
 6. The words "crooked deal" contained in the note mentioned above referred to Bethea's authorization of SITO contrary to regulations and practice for the purpose of passing a benefit to Delcher.
 
 
 31
 We acknowledge that it is possible that Bragg and Bethea participated in a scheme to defraud the government. After a painstaking review of the voluminous record in this case, however, we are not satisfied that, based on the evidence adduced at trial, a reasonable jury could have concluded beyond a reasonable doubt that the authorization of and charges for SITO were part of a scheme to defraud the government. We reach this conclusion because the evidence supporting the existence of a scheme to defraud is also strongly consistent with innocent activity. In this regard, we believe that a reasonable jury must have had at least reasonable doubt about the appellants' guilt based on the strength of the following inferences from the evidence which suggest that the actions of Bethea and Bragg with respect to SITO were innocent:
 
 
 32
 1. Bethea's authorization of SITO, although not in accord with the practice which called for a request by the service member for SITO, did serve the service member's needs with respect to the moving of the member's goods, and thereby furthered the "best interests of the member and the Government."
 
 
 33
 2. Bethea's failure to follow the practice of obtaining documentation of a request by the member reflected the fact that the regulations were not systematically enforced or followed, and this failure was the result of either Bethea's good faith effort to comply with the needs of the service members, or carelessness.
 
 
 34
 3. Bragg's endorsement of the loan for Bethea, although contrary to the conflict of interest regulations applicable to Bethea, did not result in a detriment to the government since the evidence does not establish that SITO was authorized unnecessarily for the benefit of Delcher.
 
 
 35
 4. The "crooked deal" statement in the note in Rodgers' file referred to the unusual nature of the service provided by the transportation office-i.e., ordering Rodgers' goods out of storage at his expense and into storage-in-transit at the government's expense retroactive to the date he requested-and did not refer to anything illegal.
 
 
 36
 The main thrust of the government's case was that SITO had been authorized by Bethea where the service member had not specifically requested SITO. The prosecution contended that this was contrary to Department of Defense regulations, specifically DoD 4500.34-R § 6006 and A.R. 55-71 § 6-3.[3] These regulations do not specifically require a member request for SITO, although A.R. 55-71 appears to contemplate such a request. The standard established by DoD 4500.34-R § 6006 is that SITO may be authorized when it is in "the best interests of the member and the government." Although the testimony offered at trial regarding the meaning of these regulations was conflicting, there was testimony by three employees of the Transportation Office at Fort Benning that the normal practice at that office was to obtain a written request from a member before authorizing SITO. Bethea had developed Form 48 for this purpose.
 
 
 37
 However, the lack of documentation in the files of a member's request for SITO, even coupled with the testimony of members that they did not actually request SITO, does not establish that Bethea authorized SITO or caused SITO to be authorized without regard for the need for SITO as part of a scheme to defraud the United States. The failure to ensure that there was documentation in each file to reflect a member's request for SITO may have been contrary to the spirit of the regulations and the normal practice at the Fort Benning office, but such a failure is not in and of itself a criminal act. It is undisputed that each service member is entitled to 90 days of temporary storage in connection with a change of duty station.[4] Testimony of government witnesses indicated that there are several circumstances in which SITO may be authorized in the best interests of the member without a specific request for SITO by the service member. An example of such a circumstance is a door-to-door move, where the member requests not to have his goods offloaded from the truck, but to have them delivered directly to his new address on a specified date. In one instance, a general was provided this service and the Transportation Officer himself, Colonel Berry Henderson, specifically authorized Delcher to charge for storage-in-transit at origin while leaving the goods on its truck in the warehouse. In addition, SITO may be authorized when the service member does not have a destination address. This is especially true where there is no approved storage facility with available space in the general area to which the service member is moving. SITO may also be authorized to handle other needs or requests of service members, such as a concern that goods not go into storage-in-transit at destination (SITD) in which case there is a chance that the delivery of the member's goods would be delayed.
 
 
 38
 Although the government proved that, in many files, the service member did not specifically request SITO, it did not show that Bethea's authorizations of SITO did not further the interests of the service members in question and were therefore inappropriate. In view of this, there is insufficient evidence to show that the government was defrauded by the authorization of wholly inappropriate SITO. Likewise, there is no showing that Delcher received any unjust or fraudulent benefit from the authorization of SITO.
 
 
 39
 Moreover, the government failed to prove that Bethea and Bragg had the requisite specific intent to defraud the government. Although in some circumstances intent to defraud may be inferred from a pattern of conduct, see United States v. Perez, 489 F.2d 51, 73 (5th Cir. 1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974), the repetition of SITO authorizations without documentation of member requests may well reflect a general ambivalence to such practice on Bethea's part during his good faith (or careless) efforts to satisfy the needs of the members. There is no evidence that, had this policy been vigorously enforced, less SITO would have been authorized to Delcher; Bethea would have been required to have been more diligent in contacting service members and explaining to them why his authorization of SITO would serve their needs. Likewise, the sketchy evidence that Delcher received more SITO than other movers is suggestive of the fact that Bethea funnelled SITO's to Delcher, but this inference does not support the conclusion that the authorization of SITO's was an attempt to defraud the government without proof that SITO was authorized unnecessarily.[5]
 
 
 40
 Likewise, evidence that Bethea obtained, contrary to Army conflict of interest regulations, Bragg's co-signature on a $6,000 loan from the Phenix City National Bank does not prove beyond a reasonable doubt a specific intent to defraud the government. Although this transaction may have violated a duty which Bethea owed to the government, such a breach of duty does not establish fraud under § 1341 absent some detriment to the government. See United States v. Ballard, 663 F.2d 534, 540 (5th Cir. 1981). Here, the evidence does not establish that SITO was authorized without regard to the needs of the member; therefore, the co-signature does not establish that a scheme occurred.
 
 
 41
 We find the government's contention that the security deed represents a second loan to Bethea to be unreasonable. This argument is based solely on the fact that at several places in the deed the amount of indebtedness of Bethea to Bragg is stated to be $7,000. However, the face of the recorded document indicates a change to reflect that the indebtedness is $6,000. The government produced no evidence of any separate loan to Bethea or payments on such a loan if one existed. Additionally, there is no evidence suggesting that the security deed was anything but an effort on Bragg's part to be secured against the possibility that Bethea would default on the loan-which action would be more indicative of an arms-length transaction than a fraudulent payoff.
 
 
 42
 The note contained in the file of Guy Rodgers which Bethea wrote to a fellow employee in the transportation office to the effect that "a letter wouldn't be too wise in a crooked deal like this" is the strongest evidence which could be construed to establish Bethea's intent to defraud. However, the evidence in that file indicates that the goods of Sgt. Rodgers, who had been hospitalized, were in nontemporary storage at his expense when, on December 7, 1971, he requested the transportation office to pick up his goods as soon as possible. SITO was authorized as of that date; however, Rodgers had listed on his application for shipment and/or storage that the goods were in storage at Lambert Moving & Storage, when in fact they were stored at Delcher. When this was established some time later, Bethea authorized SITO retroactively, thereby satisfying the request of the member that his goods be taken out of storage at his expense on December 7. His requested delivery date was January 14, 1972, a date far enough after the requested pick-up date to require storage. Bethea's actions, although not expressly permitted by the language of the regulations, benefited the member by allowing him to take advantage of the SITO to which he was entitled and to avoid the necessity for Rodgers to pay for the storage personally. Consistent with these facts, the language in the note may refer to the unusual nature of this file and the unorthodox authorization of SITO to save the service member storage expense; these facts do not indicate that the remark pertained to an effort by Bethea to authorize SITO for the benefit of Delcher. Sgt. Rodgers' testimony does not indicate that he did not request immediate transfer of his goods out of nontemporary storage; in fact, Rodgers was unable at trial to corroborate the destination to which his goods were sent. Delcher could have benefited from this transaction only to the extent that there is some differential in the rates applicable to nontemporary and temporary storage-an argument that the government did not make with respect to this file.
 
 
 43
 The government also argues that it was fraudulent for Delcher to charge for the handling component of SITO in cases where a service member's goods were stored on the moving truck, rather than in the warehouse. In cases where it was necessary to store goods on the truck when SITO was authorized by Bethea or his associates, there is no evidence that Bethea had any knowledge that this charge was made by Delcher. There is no showing that Bethea reviewed the files to see what charges were in fact made after SITO was authorized.
 
 
 44
 Based on the evidence as a whole, we conclude that there is not substantial evidence to support the theory that the authorizations of and charges for SITO were part of a scheme through which Bethea and Bragg defrauded the government. Although the conduct of Bragg and Bethea may be somewhat suspicious, their actions are consistent with innocent activity, and a reasonably-minded jury must have had at least a reasonable doubt about whether the SITO charges were part of a scheme to defraud and whether Bragg and Bethea had the specific intent to defraud the government through SITO charges.
 
 
 45
 There is no evidence that Bethea participated in any aspect of the alleged scheme to defraud other than the authorization of SITO. Since we hold that the evidence does not establish that the conduct of the appellees with respect to SITO was part of a scheme to defraud the government, Bethea's convictions on Counts III and IV must be reversed.[6]
 
 
 46
 Although there is insufficient evidence to prove that Bragg's actions in charging SITO to the government were fraudulent, there is additional evidence that Bragg participated in a scheme to defraud the government by inflating weights used to calculate charges for nontemporary storage and by charging for accessorial and other services not provided. However, in the five mail fraud counts, Counts III-VII, mailings were alleged only with respect to five particular service members, and the files of these service members contain evidence relating only to SITO, but no evidence at all with respect to any inflation of weights or other improprieties.
 
 
 47
 It is well established that, in order to satisfy the statutory requirement that the mails must be used for the purpose of executing the scheme to defraud, the government must show that "the thing mailed was an integral part of the execution of the scheme so that the use of the mails was in this way 'incident to an essential part of the scheme.' " United States v. Kent, 608 F.2d 542, 546 (5th Cir. 1979), quoting Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Accord, United States v. Rodgers, 624 F.2d 1303, 1309-10 (5th Cir. 1980), cert. denied, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981); United States v. Knight, 607 F.2d 1172, 1175 (5th Cir. 1979). Therefore, where the mailings which serve as the basis for mail fraud counts relate only to an activity, i.e., SITO here, which the government has not proved to be part of a scheme to defraud, the mailings are insufficient to support mail fraud convictions. In this case, because the mailings relate only to the SITO allegations, which the government was unable to link sufficiently to a scheme to defraud, and do not relate to any of the other alleged devices to defraud, the mailings could not have been "incident to an essential part of the scheme." Therefore, Bragg's convictions on Counts III-VII must be reversed also.
 
 
 48
 We believe that it will be helpful to an understanding of our holding on the mail fraud issue to examine the files pertaining to the specific mailings alleged in Counts III-VII. Count III related to the file of Chief Warrant Officer James G. Baque. Baque's application for shipment and/or storage, Form 1299, indicates that he requested that his goods be picked up on February 25, 1975, and delivered March 3, 1975, a date within the seven-day transit period. The government bill of lading (GBL) states that this was to be a door-to-door move. The GBL indicates that the goods were delivered on February 28, 1975; Baque maintained at trial that he received the goods on February 26, 1975, the day after they were picked up by Delcher. Baque further testified that he did not request SITO. Delcher received payment for a 30-day block of SITO in connection with this shipment.[7] The authorization of SITO with respect to this file is consistent with innocent activity. Given the evidence that SITO may be authorized to facilitate a door-to-door move with a delivery date within the allowable transit period,[8] it is reasonable to conclude that the authorization of SITO in this case was necessary to serve the interest of the member and the government to obtain such a move.
 
 
 49
 The mailing in Count IV pertained to Captain Tony R. Merriweather. Captain Merriweather testified on direct examination that he did not specifically request SITO. On cross-examination, however, he stated that he had requested that his goods be left on the truck after being picked up so as to avoid possible storage-in-transit at destination, which might delay the delivery of his goods to his quarters. When asked if he had therefore requested storage, Merriweather testified that he had. (Record, vol. 13, p. 51). This file is indicative of cases where a request for storage is subsumed within the member's request for a door-to-door move. In such a case, the authorization of SITO would facilitate the member's request for a door-to-door move and would therefore be in the best interests of the member and the government. In these files, the lack of documentation of a specific request for SITO is understandable. Since what the member desires is a door-to-door move, and unless the transportation office informs the member that authorization of SITO is the manner by which he will obtain a door-to-door move, there is no reason to expect that the member would make a specific request for SITO.[9] This innocent explanation of the authorization of SITO in cases involving door-to-door moves must give a juror a reasonable doubt regarding the fraudulent nature of such SITO authorizations, and the mere lack of documentation in the files, although contrary to preferred practice at Fort Benning, does not dispel this doubt.
 
 
 50
 In Count V, the mailing alleged was with respect to the file of Mr. John Purnell. Mr. Purnell did not specify the destination when he applied for shipment of his goods. His goods were picked up on July 8, 1975, and placed into storage-in-transit. Sometime around July 13, Purnell informed the transportation office by phone of the location of his home, and the goods were taken out of storage on the 13th. (Record, vol. 13, p. 9). Apparently, the goods were delivered on July 19. Neither the file nor the testimony of Purnell indicates where the goods were in the interim. There is no documentation in the file of Mr. Purnell's call requesting delivery. This file is an example of situations where SITO was authorized where no destination address was given by the service member. Although Colonel Henderson testified that SITD, not SITO, should be authorized whenever possible to avoid potential duplication of charges, (Record, vol. 17, p. 42), both Carolyn Coker and Pat Porter testified that SITO would be proper when the member did not specify an address or have available accommodations at destination, at least when there was a request for SITO. (Record, vol. 16, pp. 130, 221). While we may agree with the Colonel that authorization of SITD in this case may be preferable to avoid duplication of storage, it appears that the understanding of his CTAs and their practice was otherwise. In this type of case, we believe that there must be a reasonable doubt regarding the fraudulent nature of the authorization of SITO. The failure to obtain a documented request for SITO in such a case where there exists an underlying basis for authorizing SITO does not alter that conclusion.
 
 
 51
 The mailing alleged in Count VI relates to Captain William Boone, who had requested a door-to-door move, so that his goods would not be offloaded. (Record, vol. 13, pp. 58, 61). He later found his quarters to be unacceptable, so that when his goods were sent to Fort Gordon, they could not be delivered. The goods went into SITD there. Id. p. 63. Based on the foregoing discussion, the authorization of SITO in such a case does not appear to give rise to an inference of fraud, but seems quite reasonable.
 
 
 52
 In the mailing alleged under Count VII, Sgt. D. S. Leak requested that his goods be moved from Standing Rock, Alabama, to San Antonio, Texas. At the time he made his application for storage, Mr. Leak was in Alaska. Mr. Leak did not have a specific destination address, and he testified that he had anticipated that his goods would have to go into storage at destination. (Record, vol. 12, pp. 128, 129). His file does not, however, contain a request for SITD. Leak's application was sent from Alaska to Fort Benning, and there is some evidence of delay in the making of the arrangements for the packing and picking up of his goods, as the Form 1299 indicates that Delcher received only one day's notice before the goods were to be picked up. The testimony of Pat Porter indicates that the transportation office at times would offer SITO to carriers as a means to obtain desired service in unusual cases, (see Record, vol. 16, pp. 223, 226), and this file appears to present such an unusual case. Although this approach may well be contrary to the spirit of the regulations, the mere fact that Bethea utilized it in some circumstances does not indicate fraudulent behavior when other members of the same office did so as well, in apparent good faith.[10]
 
 
 53
 In summary, we believe that a reasonable jury must have had a reasonable doubt with respect to the proof that Bethea and Bragg had knowingly participated in a scheme to defraud the United States through charges for SITO. Despite the testimony that the general practice at Fort Benning was to obtain a service member's request for SITO before it would be authorized, we do not believe that the absence of documentation of member requests for SITO, even accompanied with testimony from members that they made no such request, establishes proof of a scheme to defraud. Viewed as a whole and in the light most favorable to the government, the evidence of guilt is not substantial. We conclude that the jury must have entertained a reasonable doubt, and therefore we reverse the convictions of both Bethea and Bragg on mail fraud counts.
 
 III. VIOLATION OF RICO § 1962(c)
 
 54
 Both Bethea and Bragg were convicted under Count II of the indictment of violating 18 U.S.C.A. § 1962(c).[11] For the reasons set forth below, we reverse both convictions on this count and remand for the entry of judgments of acquittal for both appellants.
 
 A. Bethea
 
 55
 Count II alleged that all defendants had participated in the conduct of Delcher Moving & Storage, Inc. through a pattern of racketeering activity. Various acts of mail fraud were alleged as the pattern of racketeering activity. Thirty-five mailings allegedly made in furtherance of a scheme to defraud the government were identified in Count II.
 
 
 56
 As we have noted above, Bethea's only connection to any alleged scheme to defraud was his authorization of SITO on moves handled by Delcher. Because we hold that the evidence is insufficient to establish a scheme to defraud the United States with respect to charges for SITO, the government has failed to establish that Bethea engaged in any conduct which could be considered to have "furthered a racketeering enterprise through a pattern of racketeering activity." United States v. Phillips, 664 F.2d 971, 1014 (5th Cir. 1981). Therefore, we reverse Bethea's conviction on Count II.
 
 B. Bragg
 
 57
 The indictment charged that Bragg and the other defendants had employed several devices in carrying out the alleged scheme to defraud. These included improper authorization of SITO, inflating weights, charging for accessorial services not provided, and charging for crates and other packing materials not utilized. As noted above, there was insufficient evidence to establish that the charges for SITO were part of a scheme to defraud the government. Approximately twenty of the thirty-five mailings related to SITO alone, as did the only five mailings which occurred after February 21, 1975. These latter five mailings formed the basis for the five mail fraud counts upon which we reverse the convictions of Bethea and Bragg above. There was evidence adduced at trial to support the allegations of Bragg's involvement in a scheme to defraud employing means other than SITO. However, none of the mailings which related to any scheme involving these acts occurred after February 21, 1975.
 
 
 58
 In order to establish a "pattern of racketeering activity" to support a conviction under § 1962(c) of RICO, the government must prove "at least two acts of racketeering activity, one of which occurred after the effective date (of the RICO statute, Oct. 15, 1970) and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C.A. § 1961(5) (West Supp.1981). Under § 1961(1), an act of mail fraud in violation of § 1341 constitutes racketeering activity. Therefore, in order to convict Bragg under § 1962(c), the jury is required to find that Bragg engaged in a pattern of activity evidenced by two acts of mail fraud occurring within ten years of each other.
 
 
 59
 The RICO statute does not contain its own statute of limitations. Therefore, the general five-year statute of limitations for noncapital offenses, 18 U.S.C.A. § 3282 (West 1969), applies to RICO prosecutions. United States v. Forsythe, 560 F.2d 1127, 1134 (3d Cir. 1977); United States v. Boffa, 513 F.Supp. 444, 479 (D.Del.1980); United States v. Field, 432 F.Supp. 55, 59 (S.D.N.Y.1977), aff'd without opinion, 578 F.2d 1371 (2d Cir.), cert. dismissed, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978). This statute of limitations runs from the date of the last act of racketeering activity alleged in the indictment and proved at trial. See United States v. Davis, 533 F.2d 921, 926 (5th Cir. 1976) (§ 3282 requires that the government allege and prove at least one overt act in furtherance of a conspiracy within five years of the return of the indictment in order to sustain conspiracy conviction). Therefore, in order to convict a defendant of violating § 1962(c) by participating in a pattern of racketeering activity, the jury must find that the defendant committed at least two acts of racketeering activity, one of which must have occurred within five years of the date of the indictment.
 
 
 60
 The indictment in the instant case was returned on February 21, 1980. The statute of limitations is five years. In order for Bragg's conviction to have been proper, the jury must have found that one of the acts of racketeering activity occurred after February 21, 1975. Since there is insufficient evidence to connect any of the alleged mailings occurring after February 21, 1975,-which related only to the SITO allegations-to a scheme to defraud the government, the jury could not properly convict Bragg for engaging in a pattern of racketeering activity. In other words, the RICO Count II contained no alleged mailings occurring after the crucial February 21, 1975, date, except for the SITO mailings with respect to which we have found insufficient evidence. The several alleged mailings which do involve inflation of weights and other improprieties all occurred before February 21, 1975. There being no racketeering activity in this case which occurs after February 21, 1975, the statute of limitations bars the conviction under Count II. Therefore, we must reverse Bragg's conviction on Count II.
 
 IV. CONSPIRACY TO VIOLATE § 1962(c)
 
 61
 Count I of the indictment charged, pursuant to § 1962(d), a conspiracy to violate § 1962(c) of the RICO statute. Both Bragg and Bethea were convicted under this count.
 
 
 62
 Bethea's conviction under this count cannot stand because the only acts of alleged racketeering activity to which he was connected involved the authorization of SITO. There is no evidence of any agreement between Bragg and Bethea to defraud the government by any means other than the SITO authorizations, and insufficient evidence that the authorization of SITO was part of any scheme to defraud the government. Therefore, the evidence does not establish a conspiracy involving Bethea to violate the substantive racketeering provision of RICO. Accordingly, we reverse Bethea's conviction on Count I.
 
 
 63
 The indictment charged that Bragg conspired with four co-defendants and others known and unknown to the grand jury. Three of the co-defendants were acquitted on this count; co-defendant Bethea's conviction is reversed herein on the ground of insufficiency of the evidence.
 
 
 64
 In United States v. Sheikh, 654 F.2d 1057 (5th Cir. 1981), this court described the law applicable in cases where only one defendant is convicted of conspiracy:
 
 
 65
 The general rule of this circuit is that the conviction of only one defendant in a conspiracy prosecution will not be upheld when all the other alleged coconspirators on trial are acquitted.... However, a defendant may be convicted of conspiring with persons whose names are unknown or who have not been tried and acquitted, if the indictment asserts that such other persons exist, and the evidence supports their existence and the existence of a conspiracy....
 
 
 66
 Id. at 1062 (citations omitted).
 
 
 67
 In the present case, the district judge ruled that there was not substantial proof that any persons not named in the indictment were involved in the alleged conspiracy. Therefore, he instructed the jury that, in order to convict any defendant under the conspiracy count, they must convict at least two defendants.[12] Since the jury found Bethea and Bragg guilty and the other defendants innocent on the conspiracy count, the jury must have determined that the alleged conspiracy involved no one other than Bethea and Bragg. Under the rule set forth in United States v. Sheikh, supra, our reversal of Bethea's conviction on the conspiracy count requires us to reverse Bragg's conviction as well, because there is insufficient evidence to support a finding that Bragg conspired with anyone.
 
 V. FORFEITURE
 
 68
 Based on Bragg's convictions under 18 U.S.C.A. § 1962(c) and (d), the substantive RICO provision and the RICO conspiracy provision, the district judge ordered all of Bragg's interest in both Delcher Moving and Storage and in the Howe Richardson Truck Scales located at the Torch 280 Truck Stop forfeited to the United States under 18 U.S.C.A. § 1963(a)(2) (West Supp.1981). In view of our reversal of Bragg's convictions under both of the RICO counts, the order of forfeiture falls as well.
 
 
 69
 VI. APPEALS RELATING TO REIMBURSEMENT OF ATTORNEY'S FEES
 
 
 70
 Both Bragg and Roy Fugate have brought separate appeals (Nos. 80-7756 and 80-7841) from the rulings of the district court denying their motions to obtain indemnification from Delcher Moving and Storage, Inc. for the legal fees they expended in their defense and appeals in this case. The district court based its rulings on the fact that Delcher Moving and Storage, Inc. had been forfeited to the government under 18 U.S.C.A. § 1963(a)(2) (West Supp.1981). Since the order of forfeiture falls and Delcher Moving and Storage, Inc. is no longer subject to forfeiture under § 1963, these appeals on the indemnification questions are dismissed as moot.
 
 VII. CONCLUSION
 
 71
 For the reasons set out in Parts II through V of this opinion, the judgments below in No. 80-7651 are reversed and the case is remanded to the district court with instructions to enter judgments of acquittal on all counts in favor of both appellants, thus also nullifying the forfeiture. The appeals in Nos. 80-7756 and 80-7841 are dismissed as moot.
 
 
 72
 REVERSED as to No. 80-7651.
 
 
 73
 DISMISSED as to Nos. 80-7756 and 80-7841.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 [1]
 See Department of Defense Regulation 4500.34-R § 6006(a), note 3, infra
 
 
 [2]
 18 U.S.C.A. § 1341 provides:
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 
 
 [3]
 Department of Defense Regulation 4500.34-R § 6006 provides, in pertinent part:
 6006. Storage-in-transit (SIT). a. General. As provided in applicable tariffs/tenders SIT will be used when necessary to meet the needs of the member. Although SIT normally is used at destination when the member does not have a delivery address established by the time the shipment arrives at the destination, SIT may also be used at origin or at an intermediate point when considered to be in the best interests of the member and the Government. Loss and/or damages occurred in shipments being delivered from SIT will be reported by consignee on the reverse of the DD Form 619.
 b. Prevention of unnecessary SIT. The ITO will make every effort to prevent unnecessary SIT by close liaison with the installation personnel assignment offices and housing offices. Timely knowledge of the member's status will enable the ITO to preclude unnecessary SIT. The ITO will establish a file for inbound personnel to include such information concerning the member as telephone numbers on and off-base, temporary address, and name and telephone number of a local contact in the event the member cannot be located when the shipment arrives. When a shipment arrives the ITO will endeavor to locate the member or his agent at his designated point of contact prior to authorizing SIT. If the member has not reported to the destination ITO, and/or the
 ITO is unable to locate the member or his agent, the ITO will instruct the carrier to place the shipment in SIT rather than attempt to make delivery to a member's residence.
 AR. 55-71 § 6-3 provides:
 6-3. Application for storage. Normally, applications for storage of household goods will be made by the owner (military and civilian) to the nearest transportation officer. When it is not feasible for the owner to submit an application for storage, the application may be made by any person acting under the owner's power of attorney or written authorization or by the commander of a military installation or his authorized representative. A duly authenticated true copy or photostatic copy of the power of attorney or informal letter of authority containing all pertinent data, will be acceptable in lieu of the original document. When the application is made for the owner by the commander of a military installation or his authorized representative, it will be supported by a statement showing necessity for storage and the reason for nonavailability of the owner's application.
 
 
 [4]
 Col. Berry Henderson, Transportation Officer at Fort Benning, testified that between 50 and 80 percent of all service member moves require storage-in-transit. Record, vol. 17 at 131
 
 
 [5]
 The paucity of evidence on this point may stem from the fact that the district judge prohibited counsel from exploring transportation files with respect to other carriers where SITO had been authorized. See Record vol. 17 at 99. Specific evidence relating to the use of SITO by other carriers and to the manner in which SITO was authorized in those cases would have been relevant to the issues of whether a scheme existed and whether appellees had the requisite intent to defraud
 
 
 [6]
 Although five counts, Counts III-VII, allege mail fraud, Bethea was acquitted on Counts V, VI and VII and was convicted only on Counts III and IV
 
 
 [7]
 All charges for SITO are made in 30-day increments. Therefore, the discrepancies in amount of time that these goods were in storage would not, by themselves, indicate that there was an overcharge for SITO
 
 
 [8]
 Evidence that this was the general understanding of the CTAs at Fort Benning during the period in question is found in the testimony of Pat Porter, a government witness who served as a CTA at Fort Benning. She testified that it was proper for the transportation office to authorize SITO if the service member requests delivery on a specified date, and that this had been done, even if it is within the seven-day transit period. (Record, vol. 16, pp. 224, 227). Porter also testified that SITO could be authorized while keeping goods on the truck depending on the circumstances, and later noted that she had in fact done so on occasion. (Id., pp. 222, 238). She also testified that she had authorized SITO in cases to accommodate a member's request for a door-to-door move. (Id., p. 185). Carolyn Coker, another CTA called by the government, testified that she had authorized SITO in cases where the service member has requested a specific delivery date. (Record, vol. 15, p. 271). She further testified that such a practice is legitimate if requested and if there was something to indicate that the service member was aware that storage had been authorized. Id
 In his testimony, Colonel Henderson voiced his opinion that SITO should not be authorized in most cases, since there is a chance that SITD would also be required. (Record, vol. 17, p. 40). He also indicated the request for a specific delivery date would not support authorization of SITO. Id., p. 81. However, Col. Henderson himself authorized SITO in one general's case where the general's goods were not offloaded from the truck, in order to reduce handling of the goods and to ensure that the goods were delivered when the general requested. Without discrediting Col. Henderson's testimony as to what the practice ideally should have been, we note that the testimony of the CTAs responsible for authorizing SITO indicated that the actual practice at Fort Benning allowed SITO in the instances enumerated above. Therefore, we conclude that the authorization of SITO in a door-to-door move situation does not evidence a scheme to defraud. It is our opinion that a reasonable jury must have had a reasonable doubt with respect to the existence of a scheme to defraud the government with respect to SITO.
 
 
 [9]
 Col. Henderson, the Transportation Officer, agreed that an average service member would probably ask a transportation counselor (who assists the member in applying for a move) if he could get a door-to-door move, rather than making a specific request for SITO. (Record, vol. 17, p. 132). Moreover, Pat Porter testified that SITO is not always necessary in door-to-door moves, and that personnel in the transportation office would often attempt to locate a carrier that would perform a door-to-door move without charging for SITO. (Record, vol. 16, p. 225). Therefore, there is no reason to expect that a transportation counselor would in every case respond to a member's request for a door-to-door move by informing him that a request for SITO would thereby be necessary, and there is no testimony to that effect
 
 
 [10]
 There is another hypothesis of innocence with respect to this file. The move in question was conducted in the summer during which time the frequency of moves is greatest. Since Leak's goods were being sent to San Antonio, an area in which there are four military bases, (Record, vol. 12, pp. 139-40), it is certainly possible that there was no storage available at destination when the goods were picked up. There is testimony that, generally, if there is no storage available at destination, a TWIX telegram to that effect is placed in the member's file. (Record, vol. 16, p. 199). However, other testimony indicates that the TWIX's were kept in a separate file, which has since been destroyed. (Record, vol. 16, p. 67). While this hypothesis might not, by itself, create a reasonable doubt which a jury must have recognized, it does add some weight to the reasonable doubt, discussed in the text, which we find the jury must have entertained
 
 
 [11]
 18 U.S.C.A. § 1962(c) provides:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 [12]
 Judge Varner's instruction on this count reads as follows:
 As to count one, you may or may not find any two of these people guilty. It would be improper to find one of them guilty because there is nobody else involved and it couldn't be a conspiracy between one person, and there hasn't been any substantial proof of anybody else being involved. So if you find anybody guilty in count one, the conspiracy charge, it has to be more than one of these defendants.
 Record, vol. 21 at 18.