26 F.3d 134
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Monty G. MASON, II, Richard B. Noyer, Leonardo Radomile, and
Lewis Koss, Defendants-Appellants.
 Nos. 91-50690, 91-50691, 91-50702, 91-50706 and 91-50712.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 3, 1993.
Decided June 15, 1994.
 
 Before: FLETCHER, PREGERSON, and NORRIS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 OVERVIEW
 
 2
 Appellants Monty Mason II, Richard Noyer, Leonardo Radomile, and Lewis Koss appeal from their conviction and sentence for RICO and mail fraud, in violation of 18 U.S.C. Secs. 1962(c) and 1341. Appellant Mason also appeals from his conviction and sentence for false declarations before a grand jury, in violation of 18 U.S.C. Sec. 1623. Sentence was imposed on September 23, 1991. Mason was sentenced to forty-six months on each of eleven counts to run concurrently and fined $25,000. Noyer was sentenced to forty-two months on each of two counts to run concurrently and fined $50,000. Radomile was sentenced to thirty-seven months on each of thirteen counts to run concurrently and fined $100,000. Koss was sentenced to forty-six months on each of four counts to run concurrently and fined $100,000. Additionally, all defendants were placed on supervised release for three years. We have jurisdiction to consider these appeals under 28 U.S.C. Sec. 1291.
 
 
 3
 The appellants challenge their convictions on numerous grounds, including denial of their motions to sever, alleged juror misconduct, alleged error in the admittance or exclusion of certain exhibits and witness statements, alleged government vouching for witnesses, challenges to jury instructions, challenges to the sufficiency of the evidence, challenges to inconsistent verdicts, and challenges to imposed fines. We affirm.
 
 BACKGROUND
 
 4
 This case involved illegal and unethical schemes by a network of Southern California attorneys. Appellants and their employees and associates, called the "Alliance," defrauded insurance companies of millions of dollars in legal fees through systematic control, manipulation, and prolongation of complex civil litigation. Alliance members knowingly represented adverse interests, financed litigation opponents, shared litigation and office expenses, and paid kickbacks to each other and the clients they represented. Twelve attorneys and six non-attorneys either pled guilty or were convicted of crimes arising from their participation in the Alliance.
 
 
 5
 Count 1 of the Indictment (the RICO count) alleged that Appellants participated in a criminal enterprise (the Alliance) through a pattern of racketeering activity. This pattern consisted of numerous mail fraud violations. The Indictment alleged seventy-seven different mailings related to various schemes to defraud through civil litigation. Ten complex civil litigations were referenced by name in the Indictment, but six were used to establish the pattern of racketeering activity. Those civil litigations were dubbed: Willow Ridge, Cremation, Amgo, Syndico, North American Thoroughbreds, and Disterdick. Each litigation encompassed numerous individual lawsuits and generally involved underlying investment deals that turned sour. Civil pleadings served on various Alliance members through the mail constituted the mailings in furtherance of the various litigation schemes. Mailings related to the Amgo litigation, Syndico litigation, and Disterdick litigation were realleged in Counts 2 through 37 as substantive mail fraud violations.
 
 
 6
 The following is a brief outline of the schemes promulgated by the Alliance between 1984 and 1987.[1] Insurance companies sell policies which give rise to a duty to defend their insureds against lawsuits filed against them. Before 1984, insurance companies selected the attorneys who would represent their insureds. In December of that year, the California Court of Appeal decided[2] that insurance companies no longer had the right to select counsel for the insured (under certain circumstances). Instead, the insured now had the right to choose. These attorneys became known as "Cumis" counsel.
 
 
 7
 Lynn Stites, the organizer of the Alliance, established a network of law firms over which he had control and maintained a financial interest. Sue Rubin, his administrative assistant, aided him in all aspects of expanding his network of firms. Stites would coordinate the litigation among the defendants' attorneys who he assigned through intermediaries to various insured defendants. And he controlled, with few exceptions, the plaintiffs' attorneys in these litigations to insure that the case would settle, if at all, only when the insurance companies were no longer willing or required to pay the costs of the Cumis counsel defense. In addition, the defendants recruited by Stites to be represented by Alliance members were paid kickbacks by Stites to acquiesce in the plan and resist settlement of their lawsuits until the insurance companies were unable or unwilling to continue paying for the Cumis counsel.
 
 
 8
 The government's evidence indicated that Stites required participating Alliance members to follow three rules: (1) members were not allowed to talk about the cases to anyone; (2) they were not to cooperate in any way with the insurance companies who were required to pay their fees; and (3) they were not to settle a lawsuit without prior authorization from Stites.
 
 ANALYSIS
 A. JOINDER
 
 9
 Fed.R.Crim.P. 8(b) allows the joinder of defendants where the defendants are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. United States v. Sanchez-Lopez, 879 F.2d 541, 550 (9th Cir.1989). Rule 8(b) is construed liberally in favor of joinder. Id. at 551. And defendants who are indicted together in federal court should generally be tried together. United States v. Tootick, 952 F.2d 1078, 1080 (9th Cir.1991). Joinder is favored in federal criminal cases for reasons of judicial economy and efficiency, despite the possibility of prejudice inherent in joint trials. Id. However, Fed.R.Crim.P. 14 allows a trial court to grant severance if codefendants would be prejudiced by joinder. Id.
 
 
 10
 Appellants contend that the district court erred in denying several motions to sever under Fed.R.Crim.P. 14. A district court's decision whether to sever under Rule 14 is reviewed for an abuse of discretion. United States v. Cuozzo, 962 F.2d 945, 949 (9th Cir.) cert. denied, --- U.S. ----, 113 S.Ct. 475 (1992) (citing United States v. Castro, 887 F.2d 988, 996 (9th Cir.1989). The parties seeking reversal of a denial of a motion to sever must prove that the joint trial caused such "clear," "manifest," or "undue" prejudice that the accused were denied a fair trial. United States v. Cuozzo, 962 F.2d at 950 (citing United States v. Castro at 996).
 
 
 11
 Before trial, all defendants moved for a severance of Noyer, Koss, and Mason from Radomile on the ground of antagonistic and mutually exclusive defenses. The district court initially avoided the issue by setting two separate trials, (one including Radomile and the other including Noyer, Koss, and Mason), for the fifteen defendants then in the case. However, guilty pleas eventually reduced the number of defendants to eight, so the court denied the severance motions and set a joint trial.
 
 
 12
 To obtain severance on the ground of antagonistic and mutually exclusive defenses, the codefendants must show that the acceptance of one party's defense precludes acquittal of another defendant. United States v. Sherlock, 865 F.2d 1069, 1081 (9th Cir.1989). Antagonism between the defenses must rise to the level of being irreconcilable and mutually exclusive. Id. This typically occurs where each of two defendants claims innocence, while seeking to prove that the other committed the alleged crime. United States v. Tootick, 952 at 1081 (citations omitted). Mere inconsistency in defense positions is insufficient to meet this standard. Id.
 
 
 13
 During trial the district court considered and rejected the severance arguments raised here by the defendants. The court stated:
 
 
 14
 Radomile does not need to prove the existence of the Alliance to exculpate himself, nor does Noyer. Indeed, it is perfectly consistent with Radomile's defense that the Alliance did not exist....
 
 
 15
 Now, likewise, the innocence of these [other] defendants ... does not hinge on Radomile himself being proven guilty. Each can also claim that there was no Alliance, but if there were, he or she were innocent dupes like Radomile claims to be.
 
 
 16
 The Appellants' defense positions were not irreconcilable or mutually exclusive. Radomile and Noyer contended that they were victims who sought to expose the Alliance. Mason contended that he had represented the best interests of his clients.
 
 
 17
 Further, the jury's verdicts demonstrate that the acquittal of one was not dependent upon the conviction of another. All Appellants were convicted on Count 1 (RICO), Noyer was convicted of one count of mail fraud, Koss was convicted of three counts of mail fraud, Radomile was convicted of eleven counts of mail fraud, and Mason was convicted of eight counts of mail fraud and three counts of perjury. The four other defendants who stood trial with the Appellants, all of whom sought severance from Radomile, were acquitted of all charges. The verdicts indicate that the jury considered the evidence as it related to each Appellant, irrespective of the various defense theories presented.
 
 
 18
 Radomile specifically contends that certain witness statements concerning Radomile's honesty and integrity made by Appellant Noyer's witnesses prejudiced Radomile. Further, Radomile contends that these instances show the particularly high level of antagonism present between Noyer and Radomile during the trial. However, the district court struck these brief witness statements and instructed the jury to disregard them. And although these statements demonstrate antagonism between Noyer and Radomile, this antagonism does not rise to a sufficient level to warrant reversal.
 
 
 19
 Appellants have failed to meet the burden of showing that the denial of their severance motions resulted in a manifestly unfair trial. Thus, we affirm the trial court's ruling on this issue.
 
 B. EXCLUSION OF POTENTIAL JURORS
 
 20
 Appellant Koss contends that the district court committed reversible error regarding several aspects of its jury selection. We find Koss's various claims to be without merit.
 
 
 21
 First, he alleges that the court failed to comply with the Jury System Improvements Act of 1978, 28 U.S.C. Secs. 1861-1877 in its jury impanelment. The act sets forth procedures for the clerk of the court to follow in its random selection of prospective jurors. Koss alleges that the improper exclusion of 300 persons from the jury selection panel by the court clerk without the consent of the defendants or their attorneys violated the act.
 
 
 22
 Before the court conducted voir dire, all potential jurors were requested by the clerk of the court to respond to a questionnaire. On the basis of the answer to a particular question, the clerk dismissed on behalf of the court approximately 300 people. Nowhere in the record or the briefs are we made aware of the question.
 
 
 23
 Koss' challenge must fail. Based on the record before us, we lack the specific factual information necessary to consider whether this question improperly excluded potential prospective jurors.
 
 
 24
 However, even if we had this information, Koss's contention must fail because the remedies provided by the statute are exclusive. 28 U.S.C. Sec. 1867(e). To obtain the available remedies, Sec. 1867(d) states that the defendant must timely file a motion containing "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title." A defendant who does not file this statement may not invoke the statutory remedy. United States v. Wellington, 754 F.2d 1457, 1468 (9th Cir.1985). Because Koss failed to file the necessary affidavit he is unable to invoke the statutory remedy.
 
 
 25
 Koss next alleges that he was denied adequate time for preparation of jury selection, that the inquiry as to juror bias was inadequate, and that the selection of the jury was arbitrary. The sufficiency of voir dire questions asked by the trial court is reviewed for an abuse of discretion. United States v. Dischner, 974 F.2d 1502, 1522 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1290 (1993); United States v. Payne, 944 F.2d 1458, 1474 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1598 (1992). Trial court judges are given broad discretion in their conduct of voir dire. United States v. Anzalone, 886 F.2d at 234. A defendant must show that the procedures used or the questions asked were manifestly unreasonable to constitute an abuse of discretion. Id. No such showing was made here.
 
 
 26
 Koss states that defense counsel were given less than fifteen minutes to review the jury questionnaires before voir dire. The record does not support this assertion. The record reflects that Koss's counsel advised the court that he had not had sufficient time to review the juror questionnaires and requested additional time to do so. The court subsequently gave it to him.
 
 
 27
 Koss further alleges that the court "erroneously precluded inquiry as to the attitude of the jurors as to this alleged lawyer insurance fraud case" and "fail[ed] to ask questions reasonably sufficient to test jurors for bias". The record indicates that the court informed counsel before jury selection that it would accept their input on questions to be put to the jury panel. The court did not refuse to ask any questions submitted by Koss. Koss contends that the court did not permit follow-up questions. It is not reversible error to fail to ask a question submitted by counsel so long as it does not affect a defendant's right to a fair trial. United States v. Anzalone, 886 F.2d at 235.
 
 
 28
 We cannot say that the trial judge erred in its conduct of voir dire in any of the above ways alleged by Koss, nor has Koss demonstrated how the court's reasonable exercise of its discretion deprived him of his right to a fair trial.
 
 C. ALLEGED JUROR BIAS
 
 29
 Appellant Mason alleges that his right to a fair trial by an impartial jury was violated by the trial court's refusal to dismiss juror Brady.
 
 
 30
 We review the trial court's ruling on jury bias for an abuse of discretion. United States v. Plache, 913 F.2d 1375, 1377 (9th Cir.1990); United States v. Sears, 663 F.2d 896 (9th Cir.1981).
 
 
 31
 During voir dire, the court advised the jury panel in its overview of the case that the Indictment referred to ten different complex litigations, including the "Cremation" litigation. The purpose in mentioning these cases was to uncover any prospective juror bias that might exist. At that time, prospective juror Tina Brady failed to disclose the possibility of a personal connection to the Cremation case.
 
 
 32
 At the start of the trial, the government's first witness testified that the Cremation case involved allegations that the remains of individuals cremated at various Southern California mortuaries had been mishandled. The following morning, juror Brady advised the court that her family had been contacted about a class action suit against the Harbor Lawn Mortuary, one of the defendants in the Cremation litigation. Although Brady's mother and sister had been interviewed by attorneys that were going to handle the case, the family decided not to pursue the litigation because it did not wish to rehash the events surrounding Brady's father's death five years earlier. Juror Brady did not participate in any of the interviews, and there is no allegation that her family was interviewed by any defendant in this trial.
 
 
 33
 Juror Brady, who eventually became foreperson, said that she did not mention her possible familiarity with the Cremation case because she was unaware during voir dire that the Cremation litigation involved cases against Harbor Lawn, the mortuary that handled her father's remains. Following questioning by the court, Mason's counsel agreed to retain Brady as a juror based on her representations that she would remain an impartial juror, deciding the case on the evidence presented.
 
 
 34
 Following additional testimony by government witness Sue Rubin concerning the Alliance's involvement in the Cremation litigation, defense counsel renewed their motions to excuse Brady. In particular, defense counsel reminded the court that Rubin's testimony about soliciting potential plaintiffs was similar to the experience of Brady's family. The defendants contended that this might dredge up painful memories for Brady. The court agreed to question Brady again. In response, Brady advised the court that the latest testimony did not raise in her mind any emotional reaction, nor did it affect her ability to remain fair and impartial. She reiterated that she had no knowledge about any other potential plaintiffs in the Cremation litigation. Mason's counsel, after stating that Brady could remain a juror, changed his mind and joined in the motion of other defense counsel to excuse Brady.
 
 
 35
 Mason does not contend actual juror bias exists in this case. Rather, he contends that the implied and presumed bias created by Brady's alleged connection to the Cremation litigation violated his Sixth Amendment right to a fair trial by an impartial jury.
 
 
 36
 Relating to juror Brady, we need to determine whether her alleged connection to the Cremation litigation presented a situation where the "potential for substantial emotional involvement, adversely affecting impartiality" was present. United States v. Plache, 913 F.2d at 1378 (citations omitted). It is undisputed that a single partial juror deprives a defendant of his right to a fair trial. Id. at 1377 (citations omitted). However, "while 'due process does not require a new trial every time a juror has been placed in a potentially compromising situation ... [d]ue process [does require] a jury capable and willing to decide the case solely on the evidence before it.' " Id. at 1377-78.
 
 
 37
 The district court did not abuse its discretion by determining that Brady was capable of adequately performing her duties as a juror. Appellants do not contend that the court did not adequately question Brady, or that the court refused to pose any questions to her that defense counsel might wish to ask. During trial, the court thoroughly questioned Brady on two separate occasions concerning her exposure to the Cremation litigation, her family's involvement therein, and any emotional reaction that might arise and affect her ability to perform as an impartial juror as a result of hearing testimony of the Alliance's participation in the case.
 
 
 38
 Mason attempts to characterize Brady's situation as similar to that of two jurors in United States v. Allsup, 566 F.2d 68 (9th Cir.1977). In Allsup, the defendant was charged with bank robbery. The district court found that two prospective jurors who worked at a different branch than the one robbed were unbiased and allowed them to serve on the jury. This Court reversed on the ground that, although their own branch had not been robbed, their employment relationship with the robbed bank and their "reasonable apprehension of violence" due to the risk of violence at the hands of potential bank robbers created the substantial possibility that the jurors would not be impartial. Id. at 71-72.
 
 
 39
 Mason attempts to characterize Brady as a potential crime victim having the same emotional response to testimony as the jurors in Allsup. But the reasoning of Allsup is inapposite here. Brady could not have been an Alliance victim because of her potential as a plaintiff in the Harbor Lawn Cremation litigation. Although the Alliance sought out potential plaintiffs like Brady and her family, the victims in the Alliance scheme were the insurance companies who were defrauded of millions of dollars in attorneys' fees. There is no allegation that the Alliance defrauded the parties they represented. And even assuming that Brady and her family would have been emotionally "victimized" by the Alliance by participating in the Cremation litigation, this victimization never happened because Brady's family chose not to participate in the litigation.
 
 
 40
 Mason repeats this error in reasoning in his comparison of the present case to United States v. Eubanks, 591 F.2d 513 (9th Cir.1979). There, this Court held that a juror on a heroin conspiracy case was presumed biased because he had two sons that were then serving prison terms for heroin-related crimes. The family situation of the juror in Eubanks mirrored the case on which he was sitting. Id. at 516-17. That is not the situation in this case. The potential for bias here is attenuated at best. No member of Brady's family ever met or was involved with any Alliance member, and juror Brady was never directly approached about becoming a plaintiff in the Cremation case.
 
 
 41
 The district court did not abuse its discretion in denying Mason's motion to excuse Brady. The potential for substantial emotional involvement and partiality does not exist here in the same manner that it existed in the cases cited by Mason.
 
 D. JURY TAMPERING AND MISCONDUCT
 
 42
 Appellant Mason contends that the district court erred in refusing to excuse certain jurors from the panel because of possible exposure to an outside attorney who had represented Lynn Stites, the Alliance ringleader, and alleged misconduct between the jurors in question.
 
 
 43
 This court reviews alleged jury misconduct independently in the context of the entire record. United States v. Madrid, 842 F.2d 1090, 1092 (9th Cir.1988), cert. denied, 488 U.S. 912 (1988) (citing United States v. Bagnariol, 665 F.2d 877, 885 (9th Cir.1981), cert. denied, 456 U.S. 962 (1982)). We accord substantial weight to the trial judge's conclusion of the effect of the alleged juror misconduct. United States v. Madrid, 842 F.2d at 1092.
 
 
 44
 During the trial, contact occurred between an outside attorney (Thomas Mezereau), who once represented Lynn Stites in some civil cases, and juror Marion Shaffstal. Shaffstal discussed this conversation with other jurors. After having been advised of the contact, the court conducted a thorough hearing, separately questioning both men to determine the nature and extent of their conversation. Further, each of the jurors involved in later discussions with Shaffstal was also questioned, with all counsel having the right to cross-examine. At the conclusion of the hearing, the court excused juror Shaffstal. Defense counsel then requested that three additional jurors be excused, and requested further inquiry on two additional issues. The court found insufficient evidence of improper jury conduct or prejudice to require the removal of the additional jurors, but granted the defense request for further inquiry on one of the two issues. The court also denied defense counsel's motions for a mistrial. A detailed cautionary instruction was given once the complete jury returned.
 
 
 45
 The trial court is required to hold an evidentiary hearing to determine the exact nature of the extraneous information upon learning of a possible incident of juror misconduct. United States v. Bagnariol, 665 F.2d at 885. The trial judge is "uniquely qualified" to appraise the likely effect and prejudicial nature of extraneous information on the jury because he or she observes the jurors throughout the trial and hears the evidence presented. Id. Thus, "the judge's conclusion about the effect of the alleged juror misconduct deserves substantial weight." Id.
 
 
 46
 Mason cites Remmer v. United States, 347 U.S. 227 (1954) ("Remmer I") as establishing a presumptive prejudice standard to be applied in situations of alleged improper communications with jurors. However, in United States v. Madrid we stated that Smith v. Phillips, 455 U.S. 209 (1982) and Rushen v. Spain, 464 U.S. 114 (1983) firmly established that a defendant must demonstrate "actual prejudice" resulting from an ex parte contact to receive a new trial. United States v. Madrid, 842 F.2d at 1093. Further, Remmer v. United States, 350 U.S. 377 (1956) ("Remmer II ") did not require a district court to call for a new trial on finding that an ex parte contact presented a "reasonable possibility" of prejudice to the verdict. 842 F.2d at 1094. Upon finding a "reasonable possibility" of prejudice, Remmer II only requires a district court to conduct a fair hearing. Id. This criteria was satisfied in the present case by the court's thorough evidentiary hearing on the matter.
 
 
 47
 Further, these cases cited by Mason are not directly controlling because Remmer, Smith, Rushen, and Madrid all involved ex parte communications. United States v. Bagnariol sheds more light on the issues presented here. Jury misconduct occurred in Bagnariol when a juror independently researched information concerning an issue at trial, then shared this information with other jurors. We found no reversible error. Following a review of the continuum of prior jury misconduct cases, we noted that reversals were not warranted where the extraneous information related only to issues not material to the guilt or innocence of the defendants. 665 F.2d at 887. Further, we reiterated that the conclusion of the trial judge, while not determinative, is entitled to great deference. Id. So long as the trial judge conducted a "prompt and thorough" evidentiary hearing and the information gathered was irrelevant to the guilt or innocence of the appellants, the jury misconduct did not require a new trial. 665 F.2d at 887-8.
 
 
 48
 During trial Judge Newcomer conducted a thorough evidentiary hearing. We find no error in the court's determination that the remaining jurors engaged in improper conduct or were prejudiced by their contact with juror Shaffstal.
 
 
 49
 Regarding defense counsel's request for further inquiry an additional issue, Mason contends that the court failed to thoroughly explore the possibility that discussions between the remaining jurors about Shaffstal's conversation with Mezereau amounted to premature jury deliberation. The only evidence of this was Shaffstal's comment that there was a stronger case against some defendants than others. A defense attorney (not counsel for Mason) wanted to inquire whether that was Shaffstal's personal opinion, or if he had begun premature deliberations with the remaining jurors. The court denied the request for further inquiry, finding that the view expressed was merely Shaffstal's personal opinion.
 
 
 50
 On the record before us, and in light of the cautionary instruction given, we find no error in the district court's denial of the motion for a mistrial.
 
 E. JURY MISCONDUCT DURING DELIBERATIONS
 
 51
 Mason further alleges that he was denied his right to a fair trial based on premature and improper jury deliberations. As noted above, this court reviews alleged jury misconduct independently in the context of the entire record. United States v. Madrid, 842 F.2d 1090, 1092 (9th Cir.1988), cert. denied, 488 U.S. 912 (1988) (citing United States v. Bagnariol, 665 F.2d 877, 885 (9th Cir.1981), cert. denied, 456 U.S. 962 (1982)). We accord substantial weight to the trial judge's conclusion as to the effect of the alleged juror misconduct. United States v. Madrid, 842 F.2d at 1092.
 
 
 52
 Mason contends that five jurors discussed the case outside the presence of the remaining jurors prematurely and improperly based on a note the court received from the five jurors on June 7, 1991 (three days prior to the beginning of deliberations). The note (Court exhibit K) read:
 
 
 53
 After the letter from juror no. 2, the majority of the jurors feel and have felt that this juror will cause a problem. She is more interested in her job then the case from the way she talks and brings it in to work on. Also she has a hearing problem and miss interprets a lot of the information given.
 
 
 54
 The note refers to a letter from juror Sparrevohn, (juror no. 2) in which she complained to the court about missing work and indicated that she was confused about changes in the starting time of trial. Mason alleges that the note "makes it apparent that at least some members of the jury were discussing the case between themselves ... before they were instructed to begin the deliberation process." This contention has no merit.
 
 
 55
 Court exhibit K does not indicate that the jury engaged in premature deliberations. There is no mention or implication that any aspect of the evidence or issues before the court was discussed substantively or otherwise by any jurors. The note merely indicates that the five jurors were concerned that juror Sparrevohn was at least partially preoccupied with her job and was not paying adequate attention to the court's instructions.
 
 
 56
 Further, Mason's counsel did not make a motion to have any jurors excused or for further inquiry into the matter after the court received the note.
 
 
 57
 Mason also contends that the district court should have questioned the jurors about an alleged argument that five jurors had outside of the courthouse on June 20, 1991 (during deliberations). Stanley Greenberg, defense counsel for another defendant, advised the court on June 24, 1991, that he had learned, without stating how, about the alleged disagreement. Greenberg admitted he did not know what was said during the discussion among the jurors. Greenberg suggested that the court question each of the five jurors individually, telling them what had been reported and asking them whether or not such an event occurred. Three defense counsel and the Government objected to this suggestion.
 
 
 58
 Mason's counsel initially advised the court that on behalf of Mr. Mason he joined Greenberg's request. But shortly thereafter he stated:
 
 
 59
 I'm not asking for the jury to be polled. I don't think that's necessary. I leave it up to your Honor's discretion. Something has to be done. They are supposed to be deliberating when they are all together, not apart.
 
 
 60
 The court declined to question the jury.
 
 
 61
 I certainly agree with the sentiments that have been expressed that it is inappropriate for the jury to be discussing this case in a group or fragment group outside the confines of the jury room.... I do believe that it would be ill-advised for me to call them in here to chastise them for what they may have done some number of days past. I will, however, make it a point today ... to instruct them that they should leave their deliberations in the jury room.
 
 
 62
 Where jury misconduct is alleged, the question is "whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Conn, 716 F.2d 550, 551 (9th Cir.1983) (quoting United States v. Klee, 494 F.2d 394, 396 (9th Cir.1974). In Conn, we held that no jury misconduct had occurred, despite the fact that jury deliberations were difficult and acrimonious. As in the present case, there was insufficient evidence to show that disagreements between jury members denied the appellant a fair trial.
 
 
 63
 Mason attempts to distinguish the present case from Conn on the basis that Conn's defense counsel was held partially responsible for the silence in the trial court record concerning whether the jury's acrimony tainted their deliberations. Mason is correct that the record here indicates some animosity between jury members.[3] However, he has failed to identify where the jury's disagreement affected any substantive issues in the case. "Heated discussions and shouted disagreement can be a human part of group decision making without prejudice to anyone's rights." Id. at 552.
 
 
 64
 The record reflects that the district court did not abuse its discretion in its careful consideration of all issues raised concerning alleged premature and improper jury deliberations. We therefore find that Mason was not deprived of a fair trial on these grounds.
 
 
 65
 F. ADMISSION OF EXHIBITS AND WITNESS STATEMENTS
 
 
 66
 Appellant Noyer alleges that Government exhibits 2-48, 2-57, and 2-59, as well as "all other computer records"[4] were improperly admitted into evidence as statements in furtherance of a conspiracy. Appellant Koss also alleges that Government exhibit 2-59 was improperly admitted into evidence, as well as certain statements of Sue Rubin which were admitted as co-conspirator statements.
 
 
 67
 We review for abuse of discretion the district court's decision to admit co-conspirator statements and for clear error the underlying factual determination that a conspiracy existed and that the statements were made in furtherance of that conspiracy. United States v. Arambula-Ruiz, 987 F.2d 599, 607 (9th Cir.1993).
 
 
 68
 Noyer alleges that Government exhibit 2-57 should not have been admitted into evidence. The Government is unable to find any citations to the trial record indicating that this was received into evidence at trial. Because Noyer has not given any further indication in either of his Reply Briefs, we need not address this issue.
 
 
 69
 Government exhibit 2-48 is a five-page document prepared by Sue Rubin outlining the fees Noyer was required to pay to Lynn Stites. Rubin testified that she personally prepared the document. She obtained the information contained therein from Andrea Verdick, who compiled the information at Rubin's request. Rubin further testified that Verdick worked under her direction as the bookkeeper and office administrator at Noyer's law firm.
 
 
 70
 Government exhibit 2-59 consisted of printouts of a floppy disc Rubin received From Bert Rufino, an Alliance bookkeeper. This exhibit listed the fees, expenses, and total billings sent to insurance companies from the various Alliance firms, as well as summaries which broke down the operation expenses of the law firms and monies due to Stites. Rubin testified that Rufino visited the law firms and obtained the information used to prepare this exhibit from the firms' books and records.
 
 
 71
 Noyer and Koss allege that because the exhibits were improperly admitted at trial, there is no independent evidence of the existence of a conspiracy separate from the out-of-court statements of the co-conspirators. We find this claim to be meritless. Sue Rubin, Jan Sonken, Anne Cochran, Marc Kent, and Bruce Ficht, plus others, all offered testimony directly supporting the court's conclusion that a conspiracy existed.
 
 
 72
 Once a conspiracy is established, the Government must present evidence establishing beyond a reasonable doubt a connection of the defendant to the conspiracy, even though the connection may be slight. United States v. Esparza, 876 F.2d 1390, 1392 (9th Cir.1989). Sufficient testimony was presented at trial by Sue Rubin and Jan Sonken concerning their personal contact with Koss and his participation in the Alliance to support the jury's findings of guilt. Rubin and Marc Kent, in addition to others, also provided adequate testimony about their direct contact with Noyer and his participation sufficiently linking him to the Alliance to support his conviction.
 
 
 73
 Thus we find the disputed exhibits and testimony properly admitted as co-conspirator statements under Fed.R.Evid. 801(d)(2)(E).
 
 
 74
 The Government asserts that Government exhibits 2-48 and 2-59 were also admissible as business records under Fed.R.Evid. 803(6). Because we find that the trial court did not err in admitting them under one theory, we need not decide their admissibility on alternate grounds.
 
 G. ADMISSION OF FAX TRANSMISSION
 
 75
 Appellant Koss contends that the trial court erroneously admitted Government Exhibit 2-60, a hard copy fax transmission of a letter from Andrea Verdick to Lynn Stites.
 
 
 76
 We review a trial court's decision to admit evidence under exceptions to the hearsay rule for an abuse of discretion. United States v. Bland, 961 F.2d 123, 126 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 170 (1992).
 
 
 77
 The exhibit was admitted into evidence through the testimony of Sue Rubin, who identified the document as one she had received from Verdick over her fax machine at her home. The fax contains information indicating that Lynn Stites and the Alliance were controlling both sides of the Amgo and Syndico litigations. Rubin testified that she had telephone conversations with Verdick before and after receiving the fax, and that she discussed the fax line-by-line with Stites over the telephone after receiving it. Following these conversations, Rubin testified that she placed the fax in a desk drawer at her home and left it there until she turned it over to the Government.
 
 
 78
 Koss argues that this exhibit was improperly admitted into evidence as a business record. The record does not reflect this. We find that the trial court correctly admitted the document under Fed.R.Evid. 801(d)(2)(E)--the co-conspirator exception to the hearsay rule. We thus reject Koss' challenge on this ground.
 
 H. EXCLUSION OF STATE OF MIND TESTIMONY
 
 79
 Appellant Mason argues that the trial court improperly excluded alleged state of mind testimony. We review a trial court's decision to exclude testimony for an abuse of discretion resulting in substantial prejudice. United States v. Slaughter, 891 F.2d 691, 697 (9th Cir.1989).
 
 
 80
 Mason alleges that the trial court erroneously sustained Government objections to certain out-of-court statements he made concerning his work on the Alliance litigations. He sought to have these statements, which he asserts reflected his state of mind, admitted through the testimony of Patty Mason (his wife), Thomas Gorman (an associate), and Geoffrey Thompson (a client in the Amgo litigation). Each question objected to referred to alleged statements of purported fact based upon Mason's memory or belief. Mason alleges that he made these statements to each of the witnesses concerning his work on the litigations at some time before trial. Mason contends that the hearsay testimony was properly offered to show his state of mind. We disagree. Further, the record is unclear as to what issue evidence of Mason's state of mind is relevant.
 
 
 81
 Fed.R.Evid. 803 provides in part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness: (3) A statement of the declarant's then existing state of mind ..., but not including a statement of memory or belief to prove the fact remembered or believed...." Three foundational requirements must be met by the proponent of the evidence. The statement (1) must have been made contemporaneous to the event being described, (2) must have been made without a chance for reflection, and (3) must be relevant. United States v. Emmert, 829 F.2d 805, 809-10 (9th Cir.1987). Mason failed to satisfy these requirements.
 
 
 82
 Assuming the proffered hearsay statements were relevant to an issue in the case, the district properly excluded the testimony concerning these statements because the remaining two factors are not present. There is no indication that the statements were made contemporaneous to the events described (the nature and events of the Amgo and Syndico cases). Moreover, the circumstances surrounding all of the statements allegedly made by Mason included opportunity for reflection, and therefore, opportunity for misrepresentation.
 
 
 83
 On the record before us, we find that the trial court committed no error in sustaining the objections.
 
 I. EXCLUSION OF CIVIL DEPOSITION
 
 84
 Appellant Noyer alleges that the trial court erred by excluding from evidence the videotaped civil deposition of Alliance member Andrea Verdick under Fed.R.Evid. 804(b)(1).
 
 
 85
 We review the district court's construction of the Federal Rules of Evidence as a question of law subject to de novo review. Questions of admissibility involving predominantly factual questions are reviewed for abuse of discretion.
 
 
 86
 Fed.R.Evid. 804 provides generally that certain statements may be admitted at trial as exceptions to the hearsay rule. Fed.R.Evid. 804(b) states that "[t]he following are not excluded by the hearsay rule if the declarant is unavailable as a witness." Fed.R.Evid. 804(b)(1) provides:
 
 
 87
 Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
 
 
 88
 Further, Fed.R.Evid. 804(a)(4) defines "unavailability as a witness" as including "unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity."
 
 
 89
 The district court denied Noyer's motion to introduce the video-taped civil deposition of Alliance member Andrea Verdick, stating, "on the state of the record before me, [Verdick] is available to come into court and testify." Further, the court left open the determination of Verdick's further unavailability to a later date and requested a copy of her civil deposition transcript for review as to the question of "similarity of motive" element of Rule 804(b)(1).
 
 
 90
 After careful review of the deposition, the court affirmed its ruling on the basis that Ms. Verdick was available to testify. However, the court also stated:
 
 
 91
 I do believe, having considered all of this, that it would be unfair to allow this deposition testimony to come in without being subject to cross on the part of the Government of the defendants, for that matter. But particularly on behalf of the Government.... You can't resolve the Government's problem. And I do think they have a right to confrontation.
 
 
 92
 I don't believe there is sufficient similarity of motive. There are certainly many similarities. But there are also essential differences. And this is a witness who was not subject to cross-examination then, nor would be now. Furthermore, if this witness' testimony is important to the defendant's case, the witness is presumably available to be brought in here.
 
 
 93
 On the last day of Noyer's case-in-chief, the court received a faxed transmission from Dr. Colburn stating that Ms. Verdick could not testify due to ill health. The court now found her unavailable to testify. Nevertheless, it reaffirmed its ruling on the inadmissibility of the video-taped testimony for the reasons noted above.
 
 
 94
 Noyer contends in his Reply Brief of October 15th that the court found the transcript to be "[a] thorough, vigorous, penetrating and exhaustive examination of the witness, as to the identical issues and parties relevant in the criminal trial." This is a clear contradiction and mischaracterization of the record. The trial court carefully considered the admissibility of the proffered deposition testimony under the appropriate standards provided in Rule 804(a) and 804(b)(1). The court ruled that because of the sufficiently different motive and lack of adequate cross-examination the deposition did not meet the appropriate standard of admissibility. Moreover, Noyer fails to articulate a single specific example of how any testimony in Verdick's deposition "directly controverted the core of the government's case ... and ... completely contradicted key government witnesses on every relevant issue alleged...." thereby exculpating Noyer.
 
 
 95
 Based on our review of the record we find no error in the district court's denial of Noyer's motion to introduce the civil deposition of Andrea Verdick.
 
 
 96
 J. ALLEGED GOVERNMENT VOUCHING FOR WITNESSES
 
 
 97
 Appellant Koss contends that the Government improperly vouched for witnesses Sue Rubin and Marc Kent during direct examination by introducing the "truthful testimony" requirement of their plea agreements. We review the district court's admission of plea agreement information for an abuse of discretion. United States v. Rohrer, 708 F.2d 429, 432 (9th Cir.1983).
 
 
 98
 During direct examination by the Government, Sue Rubin was asked whether her plea agreement included a provision that she tell the truth. Ms. Rubin replied that it did. Defense counsel objected and moved for a mistrial on the ground that the question posed to Rubin constituted improper vouching for a witness. The court denied the objection, and requested that future witnesses be asked simply whether immunity was granted.
 
 
 99
 Before continuing trial the following day, the Government advised the court that Rubin and other Government witnesses had been directly attacked in the opening statements of counsel for Koss and Mason; thus, it was proper for the Government to questions those witnesses about a provision of their plea agreements which required them to be truthful. The court agreed, stating, "because there was, in my view, then, an attack on the credibility of the witness and, therefore, it would not constitute this kind of vouching for them to show what was in the plea agreement." The court then agreed to give a cautionary instruction to the jury. The court stated:
 
 
 100
 You've heard testimony that Sue Rubin has entered into a plea agreement with the Government, and that Ms. Rubin will receive the benefit of the plea agreement if she provides truthful testimony in this case.
 
 
 101
 You are instructed that the existence of a plea agreement requiring a witness to testify truthfully does not mean that the testimony is, in fact, truthful....
 
 
 102
 Later Marc Kent testified in his direct examination by the Government that he would be subject to "all the rules of perjury if he didn't testify truthfully." Defense counsel again objected on the ground of vouching. The court held that the Government was not improperly vouching, but gave a limiting instruction anyway.
 
 
 103
 We have held that "the prosecution may not vouch for its witness by 'placing the prestige of the government behind the witness through personal assurances of the witness' veracity.' " United States v. Kats, 871 F.2d 105, 107 (9th Cir.1989) (citing United States v. Wallace, 848 F.2d 1464, 1473 (9th Cir.1988) (quoting United States v. Roberts, 618 F.2d 530, 533 (9th Cir.1980)). However, references to requirements of truthfulness in plea bargains do not constitute vouching if the references are made in response to attacks on the witness' credibility. United States v. Kats, 871 F.2d at 107 (citing United States v. Shaw, 829 F.2d 714, 716 (9th Cir.1987).
 
 
 104
 In his brief Koss states, "[i]n the opening statements by Brunon on behalf of Koss ... there was no reference to the dishonesty or untrustworthiness of the Government's witnesses, nor was there any specific reference to witness Sue Rubin and any agreement she had with the Government...." Koss's contention is incorrect. The record shows that during his opening statement, Brunon stated, "Marc Kent, the evidence will show, is a dishonest man. Sue Rubin is a dishonest woman."
 
 
 105
 This attack on the witness' credibility placed the contents of the plea agreements regarding truthfulness at issue. The district court did not abuse its discretion in allowing the Government to elicit the statements from Rubin and Kent regarding the truthfulness provisions of their plea agreements.
 
 
 106
 Koss relies on United States v. Roberts, 618 F.2d 530 (9th Cir.1980), in his attack on the admission of the witness' statements. But Roberts does not support his position. Unlike what occurred in this case, the prosecution in Roberts referred in closing argument to evidence not in the record and stated that a detective was monitoring the government witness for truthfulness. Id. at 533-34. In the present case, the Government did not offer personal assurances of the witness' veracity by stating that they were monitoring the witnesses, nor did the Government indicate that there was information supporting the witness' testimony not before the jury. Moreover, any potential prejudice was cured by the district court's cautionary instruction to the jury. United States v. Kats, 871 F.2d at 107.
 
 K. JURY INSTRUCTION RE MAIL FRAUD
 
 107
 A district court's formulation of jury instructions is reviewed for an abuse of discretion. United States v. Johnson, 956 F.2d 197, 199 (9th Cir.1992); United States v. Linn, 880 F.2d 209, 217 (9th Cir.1989). However, when there is no objection to the jury instructions at the time of trial, the court of appeals will review only for plain error. United States v. Fagan, 996 F.2d 1009, 1016 (9th Cir.1993); United States v. Boone, 951 F.2d 1526, 1541 (9th Cir.1991). Plain error is a highly prejudicial error affecting substantial rights. United States v. Payne, 944 F.2d 1458, 1463 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1598 (1992).
 
 
 108
 On appeal Koss contends for the first time that the instructions given to the jury on the elements of mail fraud were improper.
 
 
 109
 The instructions given by the trial court regarding the elements of 18 U.S.C. Sec. 1341 were taken from the Ninth Circuit model instructions. An additional instruction was given at the request of other defense counsel which follows Devitt and Blackmar Instruction 40.04. Both instructions are recognized as accurate statements of the law, and are widely used and accepted.
 
 
 110
 Koss argues that these instructions are contrary to our holding in United States v. Halbert, 640 F.2d 1000, 1007-1009 (9th Cir.1991). Koss contends that Halbert requires that a jury be instructed that the defendant must have mailed or caused to be mailed the material with intent to further the fraudulent purpose. This argument misstates our holding. There is no requirement that the jury be instructed that the defendant must have mailed the item with the intent to further the fraudulent purpose.
 
 
 111
 As Koss points out, in Halbert we stated: "What is important is the intent of the person making the statement that it be in furtherance of some fraudulent purpose." Id. at 1009. We were not referring to the items mailed. We were referring to the false promises or statements made or adopted by the defendant which were part of the fraudulent scheme to obtain money or property. Certainly those "misrepresentations" must have been made with a fraudulent intent, and the Hadley jury was so instructed.
 
 
 112
 We thus reject the ground of erroneous jury instructions as a ground for appeal.
 
 L. CONTENTION OF TWO ALLEN CHARGES
 
 113
 Appellants Mason, Koss, and Radomile allege that the district court erred by chastising the jury and giving two separate Allen charges during jury deliberations.[5] The question is whether the trial court abused its discretion in giving the Allen instruction to the jury. United States v. Cuozzo, 962 F.2d 945, 951 (9th Cir.1992), cert. denied, 113 S.Ct. 475 (1992). A determination of whether a jury was improperly coerced into rendering a verdict is reviewed "in its context and under all the circumstances." Lowenfield v. Phelps, 484 U.S. 231, 237 (1988). The record reflects that only one Allen charge was given.
 
 
 114
 The district court initially instructed the jury before deliberations on June 10, 1991. Ten days later the court received two notes, one from foreperson Brady and one from juror Sparrevohn. Court exhibit Q, received from Brady, stated:
 
 
 115
 Judge Newcomer, we have developed some very personal, emotional conflicts in our deliberations. It was not my understanding that I was to act as referee yet we are making absolutely no progress because of the unreasonableness of one juror. If you can help in any way, please do so!
 
 
 116
 Court exhibit R received from Sparrevohn stated:
 
 
 117
 There has been much angry debate in the jury room. I have sometimes been in the minority on a vote and have felt attacked by some few of the others....
 
 
 118
 This morning Alma said I was "a senile old lady." I do not take her shouts at me personally but her tirades do seem to have an effect on others in the jury room....
 
 
 119
 The court responded to these notes by advising all counsel that he intended to admonish the jury not to permit personal feelings and animosities to interfere with their real function. The jury was instructed as follows:
 
 
 120
 To say that I am dismayed and chagrined at your conduct in going about your deliberations, as reflected by these communications, is putting it as mildly as I know how to put it. I am indeed most upset that you have permitted your deliberations to denigrate into a childish squabble between individual jurors.
 
 
 121
 I, of course, have no way of knowing how this occurred; but it is very obvious, from your communications, that it is a very disruptive factor in your deliberations; and I want it stopped, and I want it stopped right away. It certainly is not worthy of you. It's in direct violation of your sworn duty to permit this kind of thing to happen and to prevent you from rendering a verdict, as you have sworn to do, and based only on the evidence under the law that I give to you and one that's fair to all interests.
 
 
 122
 The responsibility is yours to return your own verdict in accordance with the laws I have instructed you. All inferences of the defendants' guilt must be based on substantive evidence and not rest upon mere conjecture or guess. Remember: you are the sole judges of the facts. It's not the recollection of counsel and it's not the recollection of the court which governs. It's your recollection.
 
 
 123
 It is your sworn duty, under the law, in accordance with the facts as you find them, which determine whether these defendants are guilty or not guilty as to each count, as to each defendant, and to return a verdict that is unanimous, if you are able to do so.
 
 
 124
 I ask you, please, now, to go to your lunch hour, and return with a different attitude, one of attempting to find if there is a way upon which you can all reasonably conclude your deliberations.
 
 
 125
 An Allen charge is an instruction "admonishing [the] jurors to reconsider positions." United States v. Foster, 711 F.2d 871, 884 n. 8 (9th Cir.1983), cert. denied, 465 U.S. 1103 (1984) (citing United States v. Beattie, 613 F.2d 762, 765 (9th Cir.), cert. denied, 446 U.S. 982, 100 S.Ct. 2962, (1980). See United States v. Cuozzo, 962 F.2d at 951 (court's questioning of jurors to determine whether progress was made is not an Allen charge where jurors were not instructed to reconsider their opinions to reach a verdict). The jurors here were not told by the court to reach a verdict, nor to reconsider their positions in light of other jurors. The supplemental instruction focused directly on the deliberative process itself. Thus, this instruction was not an Allen charge. Further, the instruction was not coercive. It "legitimately served to clarify the district court's purpose in returning the jury to deliberation despite their seeming inability to make progress." 962 F.2d at 951.
 
 M. COERCIVENESS OF SINGLE ALLEN CHARGE
 
 126
 Appellants Mason, Koss, and Radomile allege that the Allen charge given by the trial court was coercive. The question is whether the trial court's instructions to the jury constituted an abuse of discretion. United States v. Cuozzo, 962 F.2d 945, 951 (9th Cir.1992), cert. denied, 113 S.Ct. 475 (1992). The test for impropriety of an Allen charge is whether, under the circumstances of the case, the instruction given had a coercive effect. United States v. Hooton, 662 F.2d 628, 636 (9th Cir.1981), cert. denied, 455 U.S. 1004 (1982).
 
 
 127
 Mason contends that the general pattern of communication, and particularly the Allen instruction given on June 24, 1991, was "clearly chock full of indicia of coerciveness." Koss contends that "in view of the fact that the court was specifically advised that there was one hold out juror against the unanimous verdict, the identity of whom was known to the judge," the court's Allen instructions violated the holding in United States v. Sae-Chua, 725 F.2d 530 (9th Cir.1984). Radomile contends that the Allen charge given by the trial court was erroneous as it implied that the Government's case was "strong and warranted conviction."
 
 
 128
 The court received a note (Court exhibit S) from the jury on June 24, 1991, which stated:
 
 
 129
 Judge Newcomer, if there are counts that we cannot come to a unanimous decision on, some of the counts, do you wish me to write the vote count on the verdict line or do you wish the line left blank? Tina Brady.
 
 
 130
 The court responded by informing the jury that a verdict must be unanimous or else it would not constitute their verdict. The court further added:
 
 
 131
 Now, members of the jury, this is an important case, and I don't need to tell you that, you're well aware of that, as to both sides.
 
 
 132
 In all likelihood, there is nothing to indicate that it could be tried better or presented any more exhaustively than it has been. It's very desirable from the standpoint of all concerned ... that you agree upon a verdict if at all possible to each of the charges, as to each defendant....
 
 
 133
 Although the verdict to which a juror agrees must of course be his or her own verdict, the result of his or her own convictions, and not a mere acquiescence in the conclusions of the other jurors ... you must examine the questions submitted to you with candor and with a proper regard for and deference of the opinions of your fellow jurors.
 
 
 134
 You should consider that the case must sometime be decided and that you were selected in the same manner and from the same source from which any future jury must be selected
 
 
 135
 ....
 
 
 136
 [I]f the larger number of you are for conviction, the dissenting juror or jurors should consider whether a doubt in his or her mind is a reasonable one which makes no impression upon the minds of as many persons equally honest with the same intention, with the same desire to arrive at the truth and within the sanctity of the same oath....
 
 
 137
 This is to say that you should not, any of you, adopt a stubborn, close-minded attitude towards your responsibilities here. It's important that you should reach and arrive at a verdict one way or the other, but only, of course, according to your convictions.
 
 
 138
 You must not, by reason of having taken a position at one time or another in the discussions, then just stubbornly adhere to that position without listening carefully and reexamining your view and reexamining the suggestions and ideas expressed by the other jurors with a view of ultimately reaching a verdict in which you can conscientiously join.
 
 
 139
 In assessing the coerciveness of a supplemental instruction, we review the form of the jury charge, the period of deliberation following the charge, the total time of deliberation, and other indicia of coerciveness or pressure. United States v. Foster, 711 F.2d 871, 884 (9th Cir.1983) cert. denied, 465 U.S. 1103, 104 S.Ct. 1602 (1984). First, we have generally upheld the instruction as not coercive "when the portion of an instruction that asks the minority to re-examine its views is counterbalanced by the caution that a juror should not abandon his conscientiously held views." United States v. Bonam, 772 F.2d 1449, 1451 (9th Cir.1985). The Allen charge given by the trial court clearly reflected the appropriate balance of these interests.
 
 
 140
 Further, the jurors continued their deliberations for approximately seven hours after receiving the disputed instruction. The length of this time period militates against a finding of coercion. See United States v. Bonam, 772 F.2d at 1451 (a verdict reached after one and one-half hours of deliberation not coerced); United States v. Beattie, 613 F.2d 762 (9th Cir.), cert. denied, 446 U.S. 982 (1980) (deliberations of three and one-half hours sufficient in particular circumstances to rebut the charge that an Allen instruction coerced a verdict).
 
 
 141
 Moreover, despite the instruction, the jury did not reach verdicts on all counts on defendants Noyer (Counts 15, 27, 28, and 29) and Mason (Counts 6 and 7). Nor did they immediately return with guilty verdicts against all eight defendants standing trial (four defendants were acquitted of all charges).
 
 
 142
 Appellants rely primarily on United States v. Sae-Chua as supporting their contention that the Allen instruction given was unduly coercive. In Sae-Chua, the trial court received a note from the jury stating that although the majority favored conviction, one juror persisted in voting not guilty despite his belief to the contrary. In response, the court polled the jurors as to whether a verdict could be reached. All but one believed a verdict was possible. Following a modified Allen charge, several hours later the jury returned a guilty verdict. 725 F.2d at 531. We reversed the defendant's conviction. First, the judge was aware of the numerical division and the identity of the dissenter. Further, there was a great risk of coercion because the dissenting juror knew that the judge was aware of the dissenter's identity. Id. at 532.
 
 
 143
 Contrary to the assertions of the Appellants, Court exhibit S does not mention the identity or identities of the minority, or of the numerical split of the jury. Thus, Koss's statement that the "court was specifically advised that there was one hold out juror against the unanimous verdict" misstates the record. Mason contends that the court knew that juror Sparrevohn was the dissenting juror based on the note from the jury of June 20th, 1991 (Court exhibit R). However, this note was received four days earlier, and contradicts Mason's assertion: "There has been much angry debate in the jury room. I have sometimes been in the minority on a vote." (emphasis added) Further, the court did not poll the jury and specifically instructed the jury not to reveal its numerical split.
 
 
 144
 Appellant Radomile contends that the Allen charge was erroneous because it suggested that the government's case was "strong and warranted conviction" based on the court's stating that "there is nothing to indicate that [the case] could be tried better or presented any more exhaustively than it has been." We do not agree with Appellant's interpretation. This comment, read in the context of the instruction, does not coerce the jury into making a decision nor suggest any outcome. It merely implies that a retrying of the case would unlikely produce a better presentation of the evidence which might make a rendering of a verdict any easier.
 
 
 145
 In sum, the record does not demonstrate the procedure followed by the district court pressured any juror(s) to reach a verdict. Thus, we find no abuse of discretion in the supplemental instruction given.
 
 N. CONSTITUTIONALITY OF RICO STATUTE
 
 146
 Appellant Noyer contends that the RICO statute, 18 U.S.C. Sec. 1962(c), is unconstitutionally vague on its face and as applied. We review de novo a due process challenge for vagueness of a statute. United States v. Powell, 423 U.S. 87 (1975). We find this contention to be without merit.
 
 
 147
 In Count One of the Indictment, Noyer was charged with violating the statute by participating in the affairs of an enterprise through a pattern of racketeering activity consisting of at least two acts of mail fraud in violation of 18 U.S.C. Sec. 1341. Noyer alleges that the RICO statute "fails to advise persons of ordinary intelligence as to what precise conduct is prohibited by its terms." Further, he contends that RICO fails to give fair and adequate notice of the type of conduct prohibited because of a lack of clarity in the meaning of the word "pattern." In addition, Noyer alleges that RICO's vague enforcement standards is overly susceptible to arbitrary enforcement. Constitutional challenges to this statute have been consistently rejected in a variety of circumstances by the Ninth Circuit and by all other Circuits that have considered the issue. United States v. Dischner, 974 F.2d 1502, 1508 (9th Cir.1992); United States v. DeRosa, 670 F.2d 889, 896 (9th Cir.1982), cert. denied, 459 U.S. 993 (1983); United States v. Campanale, 518 F.2d 352, 364 (9th Cir.1975), cert. denied, 423 U.S. 1050 (1976).
 
 
 148
 Noyer looks to H.J. Inc. v. Northwestern Bell Telephone Company, 492 U.S. 229 (1989) for support. In H.J. Inc. four justices criticized the lack of clear guidance about the exact meaning of the term "pattern of racketeering activity" (Scalia, J. concurring). However, no constitutional challenge to the RICO statute was then before the Supreme Court. Since H.J. Inc., we, along with other appellate courts, have continued to reject challenges for vagueness to the statute in criminal cases. United States v. Dischner, 974 F.2d 1502, 1509 (9th Cir.1992); United States v. Angiulo, 897 F.2d 1169, 1179 (1st Cir.1990); United States v. Pungitore, 910 F.2d 1084, 1103 (3d Cir.1990). Thus we must reject this ground for reversal.
 
 
 149
 O. ACTIVITY BEYOND REACH OF MAIL FRAUD STATUTE
 
 
 150
 Appellant Noyer contends that the activity underlying his conviction of Count 1 (RICO violation under 18 U.S.C. Sec. 1962(c)) and Count 26 (mail fraud violation under 18 U.S.C. Sec. 1341) is beyond the reach of the mail fraud statute. Specifically, he asserts:
 
 
 151
 The gist of the alleged criminal conduct underlying [his] convictions ... was that he and other members of the so called 'Alliance' churned litigation by unduly prolonging it and extending it for the purpose of generating attorney's fees to be paid by insurance companies. That conduct, however, whether or not wrongfully motivated, is protected activity which cannot be made the subject of federal mail fraud prosecution....
 
 
 152
 Further, Noyer alleges that because the RICO count relies on the same activity as the mail fraud count, the conviction on Count 1 must also be vacated.
 
 
 153
 The district court's interpretation of a statute is reviewed de novo. United States v. Valencia-Roldan, 893 F.2d 1080, 1082 (9th Cir.1990). We find no merit to this argument.
 
 
 154
 Noyer was charged with and convicted of engaging in a scheme and artifice to defraud various insurance companies and to obtain money by means of false and fraudulent pretenses, representations, and promises through control, manipulation, and prolongation of the Willow Ridge, Amgo, and Syndico litigations. Clearly this is not "protected activity."
 
 
 155
 Noyer argues that Walters v. National Association of Radiation Survivors, 473 U.S. 305 (1985), supports the notion that certain delay tactics may be appropriate litigation strategy under certain circumstances. In Walters the Supreme Court quoted an article by Judge Friendly:
 
 
 156
 Under our adversary system the role of counsel is not to make sure the truth is ascertained but to advance his client's cause by any ethical means. Within the limits of professional propriety, causing delay and sowing confusion not only are his right but may be his duty.
 
 
 157
 473 U.S. at 325 (quoting Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev., 1267, 1287 (1975)).
 
 
 158
 It is axiomatic that an attorney must apply the tools of his trade to their fullest extent in zealously representing his client. But it is an insult to the profession to assert that intentionally fraudulent conduct by an attorney is within the boundaries of professional propriety. The fee churning, over billing, prolongation of litigation, and other abusive activities practiced by the Alliance did nothing to further the cases of their various clients. Only the Alliance participants benefitted. Judge Friendly's words, while acknowledging that delay can be appropriate or even required in certain circumstances, makes patently clear that an attorney must utilize ethical means to reach his or her goals in litigation. Upon review of the record one can hardly say that the crimes perpetrated here fall within those boundaries.
 
 P. SUFFICIENCY OF PROOF OF USE OF MAILS
 
 159
 Appellant Koss alleges that the Government failed to prove the "use of the mails" requirement of the mail fraud statute. Appellant Radomile alleges that the trial court erroneously allowed the Government to prove the "mailings" requirement by means of "proof of service" forms that were inadmissible hearsay.
 
 
 160
 Sufficiency of the evidence is reviewed in the light most favorable to the Government. The standard is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992). Whether the district court correctly construed the hearsay rule is a question of law reviewable de novo. United States v. Layton, 855 F.2d 1388, 1398 (9th Cir.1988). We review a district court's decision to admit evidence under exceptions to the hearsay rule for an abuse of discretion. United States v. Bland, 961 F.2d 123, 126 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 170 (1992).
 
 
 161
 All of the mailings that formed the basis of the RICO and mail fraud convictions of Radomile and Koss were civil pleadings which included a "certificate of mailing." The mailings were clearly identified in the Indictment by date, and by name of the sender and/or receiver. The mailings that formed the basis of Radomile's RICO and mail fraud convictions were identified during trial as exhibits 100-2, 100-4, 100-6, 100-11, 100-15, 100-22, 100-24, 100-31, 100-39, 100-40, 100-41, 100-42, 100-44, and 100-58. The mailing that formed the basis of Koss's RICO and mail fraud convictions was exhibit 100-31.
 
 
 162
 At the conclusion of the Government's case, the defendants submitted a joint motion for acquittal based on insufficient proof of mailings. They contended the "proof of service" forms, attached to pleadings from the various civil litigations, were inadmissible hearsay and that no adequate foundation had been laid for their admissibility. The Government responded that the defendants had waived their objections by failing to object as each document was admitted into evidence. Further, the Government contended that the evidence of routine custom and practice within the legal profession of mailing pleadings with the forms sufficiently proved the mailings, and that the forms were admissible as "admissions by a party opponent."
 
 
 163
 The court rejected the defendants' arguments at trial. In response to a motion following trial for acquittal or new trial, the court stated in a memorandum:
 
 
 164
 It is the court's recollection, however, that there was testimony at trial regarding the routine custom and practice in the legal profession of mailing pleadings to parties to the litigation and attaching 'proof of service' to so indicate. This testimony coupled with the addresses noted on the proofs of service was a sufficient basis for a reasonable jury to conclude beyond a reasonable doubt that the mailings had in fact occurred.
 
 
 165
 The testimony to which the court refers was elicited by the Government from two of its witnesses, Fred Rucker and Robin Kurgas. Both witnesses described the purpose and procedures of these forms within the context of two of the alleged mailings. Defense counsel cross-examined the witnesses.
 
 
 166
 Appellants now contend that they were misled concerning the Government's intention to use the proof of service forms to show proof of mailing, and that there was insufficient evidence of routine custom and practice to admit the forms into evidence. We reject both of these arguments.
 
 
 167
 Regarding Appellants' first contention, we find the government's questioning of two of its witnesses concerning the purpose and use of the forms adequately served to notify the Appellants of the potential use of the evidence.
 
 
 168
 Further, evidence of routine custom and practice can be sufficient to support the inference that an item is mailed. United States v. Brackenridge, 590 F.2d 810, 811 (9th Cir.), cert. denied, 440 U.S. 985 (1979). Although Appellants contend that the Government failed to provide proof of each mailing, direct proof of mailing in not required where there is adequate evidence of routine custom or practice. United States v. Green, 745 F.2d 1205, 1208 (9th Cir.1984). The testimony of Rucker and Kurgas allowed the jury, as well as the district court, to reasonably infer that it was routine custom and practice in the legal profession to mail pleadings to the parties in the litigation and attach sworn statements under penalty of perjury within the "proof of service" forms to so indicate.
 
 
 169
 Moreover, it appears from the record that Appellants did not object to the mailings at the time the Government sought their introduction at trial. Fed.R.Evid. 103(a)(1) provides that an objection not timely made is waived. Further, "where there is no objection to hearsay evidence, the jury may consider it for whatever value it may have; such evidence is to be given its natural probative effect as if it were in law admissible." United States v. Foster, 711 F.2d 871, 877 (9th Cir.1983). A timely objection allows the Government the opportunity to lay a foundation for the admission of the disputed evidence. Id. Thus, it follows that it would be unfair to now exclude the proof of service forms based on a lack of foundation, where no objection was made when the evidence was admitted initially.
 
 
 170
 In the present case, all of the mailings except exhibit 100-44 contained signed certificates of mailing under penalty of perjury. Once they had been admitted without objection, there was no need for the Government to call additional witnesses to testify to their mailing.
 
 
 171
 Finally, even if the district court erred in admitting the forms as evidence of routine custom and practice, the forms are admissions by a party opponent and therefore not inadmissible hearsay. We may affirm the admission of evidence if an alternative theory would have justified it. United States v. Nazemian, 948 F.2d 522 (9th Cir.1991).
 
 Fed.R.Evid. 801(d)(2) provides:
 
 172
 A statement is not hearsay if ... the statement is offered against a party and is ... (A) the party's own statement in either an individual or a representative capacity, or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment ...
 
 
 173
 In the present case, the testimony at trial demonstrated that the defendants relied on the "proof of service" forms attached to their pleadings to substantiate the fact that their law offices served all necessary parties with the pleadings or documents in question. The defendants relied on the statements signed under penalty of perjury to show that they were following the appropriate rules of California civil practice procedure. They may not now deny the truthfulness of the documents. We therefore find that the "proof of service" attachments would have been admissible as admissions under Rule 801(d)(2), as an alternative ground to that articulated by the district court.
 
 
 174
 Finally, Appellant Radomile contends that Government exhibit 100-44, which formed the basis for his convictions on Counts 15 and 16, was improperly admitted because it was unsigned. Radomile is correct that it is not routine custom and practice to file unsigned forms. However, Radomile did not object when this particular exhibit was admitted into evidence. Further, there were numerous other similar exhibits which were properly executed from which a reasonable jury could infer routine custom or practice sufficient to support a finding of use of the mails.
 
 
 175
 Therefore, we find that even if this exhibit was improperly admitted, the error was harmless. Based on the great weight of the evidence presented, we do not find that it was more probable than not that the error materially affected the verdict.
 
 Q. CHARGED MAILINGS LEGALLY COMPELLED
 
 176
 Appellants Radomile, Noyer, and Koss assert that the mailings which form the basis of their respective RICO and mail fraud convictions were mandated by law, and therefore beyond the reach of the mail fraud statute. Issues involving the construction of federal law and its application to essentially undisputed facts are reviewed de novo. United States v. Doremus, 888 F.2d 630, 631 (9th Cir.1989) (citing United States v. McConney, 728 F.2d 1195, 1201-02 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101 (1984).
 
 
 177
 Each of the mailings as to which evidence was introduced at trial were civil pleadings filed in the underlying litigations. California Code of Civil Procedure Sec. 1010 requires that these types of documents be served upon all parties to a lawsuit. CCP Sec. 1012 permits service be made by mail, and CCP Sec. 1013(a) sets forth the required contents of proof of service. Appellants contend that the mailings were legally compelled as part of the various litigation schemes in question, based on these statutory requirements. In addition, Appellants cite Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171 (1960), and United States v. Tarnopol, 561 F.2d 466 (3d Cir.1977) as supporting their contentions. We disagree.
 
 
 178
 First, their argument is eviscerated by the language of the statute. CCP Sec. 1012 does not require mailing as the method of service; it merely permits it. Appellants could have made service by alternate means, such as by personal service. Although this in effect ends the need for further discussion, we will briefly address Appellants' arguments.
 
 
 179
 In Parr, nine individuals and two banks, which controlled the Benevides Independent School District, were convicted of looting the district of $200,000. Pursuant to Texas law, the district was empowered to collect an ad valorem property tax exclusively for the maintenance of the public schools. The defendants were found to have devised a scheme to defraud by appropriating the taxes collected to their own benefit and using the mails to execute the scheme by sending notices and collections incident to the taxing process.
 
 
 180
 The question in Parr was whether the mailings could properly be said to have been made for the purpose of executing the fraudulent scheme because the mailings were legally compelled incident to the taxing process. 363 U.S. at 389. The Supreme Court held that "mailings made or caused to be made under the imperative command of duty imposed by state law" were not "criminal under the federal mail fraud statute, even though some of those who [were] required to do the mailing for the District plan[ned] to steal ... some indefinite part of its moneys." Id. at 391.
 
 
 181
 Parr is easily distinguishable. The pleadings which form the basis of the mail fraud convictions were not legally required to be mailed as Appellants assert. Although CCP Sec. 1010 requires service, the pleadings could have been served by some other method.
 
 
 182
 Further, we find Appellants' citing of United States v. Tarnopol to be of little help. In Tarnopol, the Third Circuit equates "those routine mailings which are required by law" with "routine mailings, themselves intrinsically innocent, which are regularly employed to carry out a necessary or convenient procedure of a legitimate business enterprise." 561 F.2d at 472. Whatever the standard, the mailings at issue here were not employed merely as a "necessary or convenient procedure of a legitimate business enterprise." The mailings here were created for the specific purpose of defrauding the insurance companies.
 
 
 183
 Appellants overlook controlling Ninth Circuit authority, which further eviscerates their argument. Routine mailings, intrinsically innocent, and required by law, may form the basis of a scheme to defraud in violation of 18 U.S.C. Sec. 1341. United States v. Mitchell, 744 F.2d 701, 704 (9th Cir.1984). Further, "[a] mailing need not itself be false to be in furtherance of a scheme to defraud." United States v. Benny, 786 F.2d 1410, 1420 (9th Cir.1986) (citing United States v. Buckley, 689 F.2d 893, 898 (9th Cir.1982). The mailings at issue here were part of to the Alliance's scheme to defraud because they aided the defendants in unnecessarily prolonging and manipulating the various litigations. Thus, the "fraudulent scheme triggered the mailings, which would not have occurred except as a step in the scheme". Id.
 
 
 184
 In sum, the mailings were not legally compelled, nor would that fact require reversal were it so. The mailings were "sufficiently closely related to the fraudulent scheme to support a mail fraud prosecution". United States v. Tarnopol 561 F.2d at 472. Thus, they were not beyond the reach of the mail fraud statute.
 
 R. PATTERN OF RACKETEERING
 
 185
 Appellant Koss contends that the evidence at trial did not establish a "pattern of racketeering" as required under the RICO statute. The determination of a pattern of racketeering activity relies on the facts of each case. H.J. Inc. v. Northwestern Bell Telephone Company, 109 S.Ct. 2893, 2902 (1989). Thus, the issue raised is sufficiency of the evidence. There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992).
 
 
 186
 Koss was convicted of three separate predicate mailings (Counts 5, 6, and 7). The items mailed were identical copies of Government Exhibit 100-31, a Substitution of Counsel pleading. Koss asserts that the three mailings of this pleading are insufficient to constitute proof of the pattern of racketeering because of "the lack of 'threat of continuing activity' and 'repeated acts' required by the statutes and case precedent."
 
 
 187
 Liability under the RICO statute, 18 U.S.C. Sec. 1962(c), requires proof of (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Sun Sav. and Loan Ass'n v. Dierdorff, 825 F.2d 187, 191 (9th Cir.1987) (citing Sedima, S.P.R.L. v. Imrex Co., 105 S.Ct. 3275, 3285 (1985)). " 'Racketeering activity' is any act indictable under several provisions of Title 18 of the United States Code, see 18 U.S.C. Sec. 1961, and includes the predicate act alleged in this case of mail fraud under 18 U.S.C. Sec. 1341." Id. Further, in Sedima, the Supreme Court suggests that, under the "continuity plus relationship" formula, the pattern requirement exists among acts that have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and cannot be isolated events." Sedima, 105 S.Ct. at 3285 n. 14.
 
 
 188
 We most recently applied this formula to address the issue of "pattern of racketeering activity" in United States v. Dischner, 974 F.2d 1502 (9th Cir.1992). In Dischner, we noted that continuity may be established by proving a series of related predicate acts extending over a substantial period of time, or if the acts extend over only a short time period, it may be met when the nature of the acts themselves demonstrates the threat of continued racketeering. Id. at 1509 (citing H.J. v. Northwestern Bell Telephone Co., 109 S.Ct. at 2902).
 
 
 189
 The Indictment in the present case named Koss as a participant in three of the six separate mail fraud schemes: Willow Ridge, Cremation, and Amgo. Thirty-four predicate acts of mail fraud were submitted to the jury in connection with these schemes. Consistent with H.J., the jury was instructed that "[i]f you find that [Koss] is guilty of any two of these acts of mail fraud, and you all agree on which two, then you may conclude that [Koss] has committed a pattern of racketeering activity." They were further properly instructed as to the "continuity plus relationship formula" noted in H.J..
 
 
 190
 The jury returned a guilty verdict on the RICO allegation (Count 1). The jury also returned guilty verdicts on three substantive counts which were all related to the Amgo litigation (Counts 5, 6, and 7).
 
 
 191
 Although the jury had thirty other predicate acts from which to choose, the "pattern of racketeering activity" was sufficiently established by Counts 5, 6, and 7 alone. The substitution of counsel forms have "the same or similar purposes, results, participants, victims, [and] methods of commission." Sedima, 105 S.Ct. at 3285 n. 14. They are sufficiently different to constitute a "pattern" because they are separately indictable, Sun Sav. and Loan Ass'n, 825 F.2d at 191, and because they each independently expand the scope of the Alliance's fraudulent activities. And finally, since their result was to insert Koss into the Amgo litigation for the purpose of allowing the Alliance illegally to control it for as long as possible, they demonstrate "a specific threat of repetition extending indefinitely into the future," and therefore "pose a threat of continued criminal activity." H.J., Inc., 492 U.S. at 292; see Dischner, 974 F.2d at 1509. For these reasons, we find that the evidence was sufficient to support Koss's racketeering conviction.
 
 S. GOVERNMENT EXHIBIT 100-31
 
 192
 Appellant Koss also argues that Government Exhibit 100-31, the Substitution of Counsel pleading replacing Kathy Phipps with Lewis Koss as counsel in the Amgo litigation, was not mailed "in furtherance of" the scheme to defraud. Koss asserts that although billings in the Amgo litigation from his office were found to be excessive or fraudulent, because this pleading itself was not false, this mailing cannot form the basis of his conviction.
 
 
 193
 The issue raised is whether there was sufficient evidence that the mailing in question was part of the execution of the fraudulent scheme. Schmuck v. United States, 109 S.Ct. 1443 (1989). There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992).
 
 
 194
 Koss mistakenly relies on Schmuck, 109 S.Ct. 1443 (1989) for support. "To be part of the execution of the fraud, the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot." Schmuck, 109 S.Ct. at 1447-48.
 
 
 195
 Koss contends that this standard is not met in the present case because the "essential nexus with the scheme in the filing of the substitution of attorney was absent, and the filing of this document was an indifferent act with respect to the alleged scheme." The record does not support this view. The mailings here, sent by a participant in the scheme, were essential to the furtherance of the fraud. The substitution of counsel was a necessary move orchestrated by Lynn Stites to continue the Alliance's control of the Amgo litigation. Thus, the evidence presented to the jury clearly supports the jury's finding that the mailing of Government Exhibit 100-31 was a "step in the plot" in furtherance of the scheme to defraud.
 
 
 196
 T. MAILINGS UNDERLYING RICO AND MAIL FRAUD CONVICTIONS
 
 
 197
 Appellant Noyer contends that the charged mailings underlying the RICO count and mail fraud count were insufficiently linked to the scheme to defraud. The issue raised is whether there was sufficient evidence that the mailings in question were part of the execution of the fraudulent scheme. Schmuck, 109 S.Ct. 1443 (1989). There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992).
 
 
 198
 Noyer asserts that none of the charged mailings "were originated by defendant Noyer, nor was any evidence introduced that any of the mailings were themselves fraudulent, or contained any misrepresentations of fact." Further, he contends that the mailings must be an "integral part of the execution of the scheme" (citations omitted). These arguments find no support in our case law.
 
 
 199
 First, it is of no consequence that Noyer did not mail the notices. "The Supreme Court held long ago that one 'causes' a mailing for purposes of 18 U.S.C. Sec. 1341 if one acts with the knowledge that the use of the mails will follow in the ordinary course of business." United States v. Jones, 712 F.2d 1316, 1320 (9th Cir.1983) (citing Pereira v. United States, 74 S.Ct. 358, 362-63 (1954). It is sufficient that Noyer knew that the mailings were being made in furtherance of the fraudulent litigation schemes.
 
 
 200
 Moreover, as noted above, routine mailings, intrinsically innocent, and required by law, may form the basis of a scheme to defraud in violation of 18 U.S.C. Sec. 1341. United States v. Mitchell, 744 F.2d 701, 704 (9th Cir.1984). And, "[a] mailing need not itself be false to be in furtherance of a scheme to defraud." United States v. Benny, 786 F.2d 1410, 1420 (9th Cir.1986) (citing United States v. Buckley, 689 F.2d 893, 898 (9th Cir.1982).
 
 
 201
 Finally, "to be part of the execution of the fraud, the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot." Schmuck v. United States, 109 S.Ct. at 1447-48. The mailings at issue here were not "innocuous pleadings" as Noyer contends, but were necessarily created to further the Alliance's scheme to defraud by aiding the defendants in unnecessarily prolonging and manipulating the various litigations.
 
 
 202
 Noyer cites United States v. Bethea, 672 F.2d 407 (5th Cir.1982) for support. But this case is inapposite. In Bethea, the Fifth Circuit reversed mail fraud convictions because the mailings at issue were found to be incidental to the alleged fraudulent scheme. Id. at 416. Thus, Noyer attempts to characterize the mailings in the present case as merely incidental. His description of them as "run-of-the-mill legal pleadings" is not persuasive. There is nothing innocent or routine about causing to be mailed documents in furtherance of a scheme to defraud insurance companies of millions of dollars in abusive legal fees through the manipulation of civil litigation.
 
 U. NOYER'S PARTICIPATION IN THE ALLIANCE
 
 203
 Appellant Noyer asserts that the evidence was insufficient to sustain the RICO conviction (Count 1) due to a lack of proof with respect to the pattern of racketeering activity required.
 
 
 204
 The determination of a pattern of racketeering activity relies on the facts of each case. H.J. Inc. v. Northwestern Bell Telephone Company, 109 S.Ct. 2893, 2902 (1989). Thus, the issue raised is sufficiency of the evidence. There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992).
 
 
 205
 Noyer was convicted of Count 1 (RICO violation), which charged participation in three separate mail fraud schemes (Willow Ridge, Amgo, and Syndico). Each of these schemes identified separate mailings. In addition, Noyer was also charged in Counts 2-29 with the substantive offense of mail fraud; he was convicted of Count 26 (mail fraud violation based on mailing 58).
 
 
 206
 Liability under the RICO statute, 18 U.S.C. Sec. 1962(c), requires proof of (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Sun Sav. and Loan Ass'n v. Dierdorff, 825 F.2d 187, 191 (9th Cir.1987) (citing Sedima, S.P.R.L. v. Imrex Co., 105 S.Ct. 3275, 3285 (1985)).
 
 
 207
 " 'Racketeering activity' is any act indictable under several provisions of Title 18 of the United States Code, see 18 U.S.C. Sec. 1961, and includes the predicate act alleged in this case of mail fraud under 18 U.S.C. Sec. 1341." Id.
 
 
 208
 Noyer correctly states that the "pattern of racketeering" element requires the commission of two separate racketeering acts, each of which must constitute a criminal offense. If the verdict fails to establish the commission of the requisite two acts, the conviction on the RICO count must be vacated. United States v. Walgren, 885 F.2d 1417, 1424 (9th Cir.1989).
 
 
 209
 The court instructed the jury with respect to Noyer that certain mailings relating to the Willow Ridge, Amgo, and Syndico litigations could all constitute predicate acts to satisfy the RICO pattern requirement. The court also stated that if the jury found Noyer guilty of any two acts of mail fraud, and all agreed on which two, the requirement would be met. These instructions are consistent with the Supreme Court's ruling in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989).
 
 
 210
 Noyer asserts that his RICO conviction must be reversed because the government failed to prove individually two underlying requisite mail fraud offenses. However, there was no requirement that the jury convict Noyer of any the separate substantive counts that were individually charged in the Indictment. Any act indictable under the mail fraud statute may serve as a predicate offense for purposes of RICO. United States v. Busher, 817 F.2d 1409, 1412 (9th Cir.1987). Any of the mailings charged in Count 1 with respect to the three litigation schemes involving Noyer could properly have been relied upon by the jury to satisfy the RICO pattern requirement, regardless of whether the mailings were also charged in separate substantive mail fraud counts.
 
 
 211
 Nevertheless, Noyer argues that his conviction must be overturned if we find that any of the uncharged mailings are deficient because it is unclear from the record which of the uncharged mailings the jury relied upon in addition to Count 26. Within the context of RICO, where some predicate acts charged were insufficient and it cannot be determined whether the jury relied upon the invalid predicate act in reaching their conviction on the RICO charge, the RICO conviction must be reversed. United States v. Walgren, 885 F.2d at 1424. However, Noyer has not demonstrated the insufficiency of any of the uncharged mailings that the jury may have relied upon.
 
 
 212
 Regarding the Willow Ridge mailings, (mailings 2-10), former Koss employees Sue Rubin and Jan Sonken testified of their involvement in the Willow Ridge fraud scheme while employed in Koss's law office. Adequate circumstantial evidence was presented at trial from which a reasonable jury could have concluded that Noyer participated in the Willow Ridge litigation, despite Noyer's broad contention to the contrary.[6]
 
 
 213
 With respect to the Amgo mailings (mailings 24, 25, 31, and 35), Noyer alleges their deficiency because they were mailed before he entered that litigation as counsel of record. However, the evidence presented at trial again indicated that a reasonable jury could have concluded that Alliance members participated in the Amgo scheme without appearing before the court. Thus, Noyer's formal entry into the Amgo litigation was not necessary for the jury to find Noyer's participation.
 
 
 214
 Noyer concedes that mailings 31 (Amgo) and 46, 47, and 53 (Syndico) occurred during the time period that he represented Alliance parties in the litigations. Thus, the jury may "legitimately have [ ] unanimously agreed upon [one of these mailings] in constituting the other predicate offenses together with the mailing which was the subject of Count 26, mailing 58 to establish the requisite 'pattern of racketeering activity.' "
 
 
 215
 However, Noyer then asserts that none of the uncharged mailings are sufficient because "the jury was [not] instructed that it had to find, beyond a reasonable doubt, that each and every element of the offense of mail fraud was committed with respect to each of these mailings." The trial record does not support his contention.
 
 
 216
 With respect to the Willow Ridge, Amgo, and Sydico litigations, the jury was instructed in part: "If you find that each defendant is guilty beyond a reasonable doubt of any two of these acts of mail fraud and you all agree on which two, then you may conclude that each defendant has committed a pattern of racketeering activity." Regarding the Amgo and Syndico litigations, the jury was additionally instructed that: "In addition, some of these mailings are realleged as substantive mail fraud violations in [variously enumerated] Counts of the Indictment."
 
 
 217
 Immediately following the court's instructions regarding the RICO count, the jury was instructed on the elements of mail fraud. Noyer alleges that the jury should have been instructed on the elements of mail fraud during the RICO instructions, as well as during the mail fraud instructions. However, he cites no authority for this proposition. Thus, we find that the jury was adequately instructed on the elements of mail fraud in a sufficiently contemporaneous manner to the RICO instructions. The jury is presumed to have properly followed the court's instructions. United States v. Olano, 113 S.Ct. 1770, 1781 (1993).
 
 
 218
 Finally, Noyer again alleges that the evidence was insufficient to support a finding of a pattern of racketeering activity. Thus, he contends his conviction should be reversed as to the RICO count. As addressed in Issue U., we find no merit to this argument. The jury found Noyer guilty of violating the RICO statute by participating in the Alliance litigations, and guilty of one count of substantive mail fraud. Noyer has failed to demonstrate that any of the uncharged mailings upon which the jury might have relied were insufficient. Thus, there is no basis for reversal on this ground.
 
 V. INCONSISTENT VERDICTS
 
 219
 Appellant Mason argues, for the first time on appeal, that the trial court failed to find a rational basis for inconsistent verdicts on Counts 5, 14, and 26-29, because some co-defendants were acquitted based on the same presentation of evidence at trial.
 
 
 220
 We review de novo the legal determination of whether a defendant may upset a verdict because it is inconsistent with an acquittal. United States v. Hart, 963 F.2d 1278 (9th Cir.1992) (citing United States v. Smith, 802 F.2d 1119, 1126 (9th Cir.1986)).
 
 
 221
 Following trial, Mason filed a motion for a judgment of acquittal under Rule 29(c) claiming that the RICO evidence was insufficient. At no time did Mason argue that the verdicts were inconsistent, nor did he ever request the court to articulate a basis for the allegedly inconsistent verdicts. Mason now alleges that the district court erroneously failed to state a basis for the dissimilar treatment of defendants at trial.
 
 
 222
 Mason cites United States v. Duz-Mor Diagnostic Laboratory, Inc. 650 F.2d 223 (9th Cir.1981) as supporting his contention that where the conviction of one defendant and the acquittal of another is based on evidence of culpability that applies equally to both defendants, the conviction should be set aside. Id. at 227. This assertion misinterprets existing law.
 
 
 223
 Duz-Mor was tried before the court sitting without a jury. On appeal, we remanded for further proceedings to determine whether the trial judge could articulate a rational basis for inconsistent verdicts. If no rational basis were found, we directed the court to set aside the conviction as a deprivation of liberty without due process. Id.
 
 
 224
 Our ruling in Duz-Mor is inapposite. The present case was tried to a jury. There was no need for the trial court to address the issue of inconsistent verdicts. Further, in Duz-Mor we noted that, in jury trials, "[a]s a general rule, inconsistencies in jury verdicts rendered in the same proceeding do not require reversal." Id. at 226 n. 3 (citations omitted). "The rationales for permitting inconsistent verdicts in jury cases apparently are (1) that a jury verdict represents a collective deliberative process in which individual jurors may disagree about details in assessing the evidence; and (2) that courts are hesitant to inquire into jurors' individual decision-making." Id. at 226.
 
 
 225
 Moreover, the "rule of consistency," which once required us to reverse convictions of conspirators when their co-conspirators were acquitted, is no longer absolute. United States v. Valles-Valencia, 823 F.2d 381, 382 (9th Cir.1987) (amending United States v. Valles-Valencia, 811 F.2d 1232 (9th Cir.1987)). This is true even when conviction on one count is logically incompatible with acquittal on other counts, so long as there is sufficient evidence to support the guilty verdict. United States v. Powell, 469 U.S. 57, 65 (1984); Dunn v. United States, 284 U.S. 390, 393 (1932); United States v. Hart, 963 F.2d 1278, 1281 (9th Cir.1992). Inconsistent verdicts can be the result of jury lenity rather than the result of a fact determination. Valles-Valencia, 823 F.2d at 381-82 (citing United States v. Powell, 469 U.S. 57, 65 (1984)).
 
 
 226
 Mason contends that Duz-Mor provides a limited exception to this rule for the inconsistent conviction of a conspirator whose alleged co-conspirators have been acquitted. Although Mason correctly cites Duz-Mor, recent Ninth Circuit and Supreme Court cases do not support that view.
 
 
 227
 In United States v. Hart, we extensively reviewed the current case law on the issue of inconsistent verdicts, 963 F.2d at 1280-82. "While we are unable to say that in the course of the development of constitutional principles over the decades to come an exception will never be found, we perceive none at this time, or at least none that go beyond the normal safeguards against jury irrationality mentioned in Powell." Id. at 1281. In Powell, the Supreme Court stated that "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence.... We do not believe that further safeguards against jury irrationality are necessary." Powell, 469 U.S. at 67.
 
 
 228
 In the present case, a review of the trial record shows that the evidence surrounding the mailings on each count did not apply equally to all defendants, as Mason asserts. Further, despite Mason's contention that his convictions are not supported by the evidence presented at trial, we find this claim to be meritless. The record reveals sufficient evidence for a rational jury to have found Mason guilty as to the various counts for which he was convicted.
 
 
 229
 Thus, we reject the ground of alleged inconsistent verdicts as a basis for appeal.
 
 W. IMPOSITION OF CRIMINAL FINES
 
 230
 Appellants Mason and Koss argue that the trial court failed to consider their ability to pay the fines imposed in light of their earning capacity and financial resources.
 
 
 231
 We review the legality of a sentence de novo. United States v. Fine, 975 F.2d 596, 599 (9th Cir.1993) (en banc); United States v. Hahn, 960 F.2d 903, 907 (9th Cir.1992). The district court's interpretation of the Sentencing Guidelines is reviewed de novo. United States v. Blaize, 959 F.2d 850, 851 (9th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 2954 (1992).
 
 
 232
 Mason's sentence included a $25,000 fine to be paid either in a lump sum or in installments during the three year period of his supervised release. Koss's sentence included a $100,000 fine to be paid during the three year period of his supervised release. Both fines are at the low end of the Sentencing Guidelines range.
 
 
 233
 Mason and Koss allege that the trial court failed to make a finding regarding their ability to pay as required under the guidelines, beyond the findings presented to the court in the Presentence Report. Koss contends that the court failed to consider his outstanding indebtedness of $600,000, monthly spousal and child support payments, forty-six month prison term, impending civil litigation, and the loss of his license to practice law as a result of his conviction. Mason contends that the court failed to consider his negative monthly cash flow, and the loss of his license to practice law as a result of his conviction.
 
 
 234
 Appellants direct our attention to United States v. Seminole, 882 F.2d 441 (9th Cir.1989), to support the proposition that "[i]f the defendant is indigent, a fine should not be imposed absent evidence in the record that he will have the earning capacity to pay the fine after release from prison." Id. at 433. Further, Mason cites United States v. Walker, 900 F.2d 1201 (8th Cir.1990) for the proposition that the court must make specific findings itself on the ability of a defendant to pay a fine.
 
 
 235
 Unlike in Walker, during the sentencing hearing in the present case, the court reviewed the findings in the Presentence Reports, and considered the arguments and information presented by Appellants' attorneys. Subsequently, the court adopted the recommendations in the Presentence Reports. We find no error in the inquiry undertaken by the district court. Further, the defendant in Walker was fined $2 million, yet had few assets, no employment other than occasional work as a house painter, and no education beyond high school. The factual setting of Walker is a far cry from the present case.
 
 
 236
 The court had before it conflicting information concerning the defendants' financial positions. The record reflects the potential earning capacity for both defendants, as well as their current financial situations. The trial court's imposition of a fine in light of apparently conflicting information from defense counsel and the Presentence Report regarding a defendant's ability to pay a fine does not mean that the court refused to consider evidence of indigency. See United States v. Schubert, 957 F.2d 694, 697 (9th Cir.1992). The court adequately evaluated all of the information before it prior to adopting the findings in the Presentence Report.
 
 
 237
 Before his involvement with the Alliance, Mason was in private practice for many years following his admittance to the California Bar in 1968. According to the probation officer, "a review of the defendant's financial situation reveals that he has marketable skills and should be capable of obtaining a job to pay a fine within the guideline range." Mason has been offered steady employment pending this appeal at approximately $2,000 net monthly pay. The monthly installments of $850 per month for thirty-six months does not appear to unduly burden Mason.
 
 
 238
 Koss received a B.A. degree from the City College of New York in 1965, and received his J.D. degree from the University of Minnesota Law School in 1968. Koss successfully practiced law for many years before his involvement with the Alliance. While with the Alliance he made millions of dollars. Based on his educational and business background we cannot say that the trial court erred in imposing a fine.
 
 
 239
 On the record before us we find that the trial court did not erroneously fail to consider the ability of the Appellants to pay the fines imposed over a period of time. Further, we find that the trial court's conclusion that the preponderance of the evidence indicates that Koss and Mason will be able to pay the imposed fines was not improper.
 
 X. MASON'S PERJURY CONVICTIONS
 
 240
 Appellant Mason appeals from his conviction and sentence for false declarations before a grand jury in violation of 18 U.S.C. Sec. 1623. We review de novo a conviction for false statements before the Grand Jury. United States v. Boone, 951 F.2d 1526, 1533 (9th Cir.1991). We must determine "whether the jury could conclude 'beyond a reasonable doubt that the defendant understood the question as did the Government and that, so understood, the defendant's answer was false.' " Id.; United States v. Sainz, 772 F.2d 559, 562 (9th Cir.1985) (citing United States v. Cowley, 720 F.2d 1037, 1040 (9th Cir.1983).
 
 
 241
 Mason testified before the federal Grand Jury on November 22, 1988. Count 2 of the Indictment charged him with making a false statement while under oath because of his "No" response to the following question:
 
 
 242
 Q: Before meeting with Ms. Phipps and the representative of the insurance company, had you consulted with any other lawyer about what position you should take in the settlement negotiations?
 
 
 243
 Mason contends that his response was technically correct (or literally true), and, in the alternative, that the question was so ambiguous that any answer would be nonperjurious. We reject these arguments.
 
 
 244
 Mason acted as plaintiffs' counsel in the Amgo and Sydico litigations. He was given these clients and set up in his law practice by Alliance member Marc Kent, who acted as defense counsel in these litigations. The evidence at trial showed that, as part of the arrangement between them, Mason was instructed never to settle the litigations without prior approval.
 
 
 245
 Mason was questioned as a part of the Grand Jury's investigation of the activities of the Alliance. He was asked generally about the identities of people who assisted him in his practice, his role in the Amgo and Syndico litigations, and whether he knew various attorneys alleged to be part of the Alliance. The context of the inquiry put Mason sufficiently on notice that he was being asked if he had been in touch with any other lawyers regarding what position he should take in settlement discussions. There is no possible reasonable interpretation of the question posed that would render Mason's negative response as literally true.
 
 
 246
 Count 3 of the Indictment sets forth the following questions and answers taken from Mason's testimony before the Grand Jury:
 
 
 247
 Q: Is it your testimony in front of the Grand Jury that you had no other source of funds to finance that litigation?
 
 
 248
 A: That's correct. I had no other source of funds to finance the litigation. I had my clients. Some of them paid me fairly well, and I had bank loans and that was it.
 
 
 249
 Q: And who were some of these clients?
 
 
 250
 A: There was Mr. Cobell who paid me very well. There was a C.P.A. that paid me a fairly good fee, and for a while, for about six months, Mr. Al Arnold asked me to do things for him.
 
 
 251
 Q: Such as what?
 
 
 252
 A: He had some legal research he said he wanted me to do and I asked him--well, it can't have anything to do with Syndico case or something that we have connection with, you understand. And he said it doesn't. And then I said well, I agree to do it and I did it. He paid me for it.
 
 
 253
 Mason was convicted of the RICO charge and numerous mail fraud counts. The jury also found him to be a member of the Alliance. The evidence of his participation in the Alliance included a showing that he received office space, equipment, office supplies, and legal staff in return for his cooperation. The evidence also demonstrated that Mason received funds to finance these expenses through California Overseas Bank, by Al Arnold putting up certificates of deposit sufficient to guarantee a $100,000 line of credit, in addition to cash infusions.
 
 
 254
 The Government has satisfactorily proved that Mason lied under oath before the Grand Jury by proving Mason's membership and active participation in the Alliance.
 
 
 255
 In sum, all issues on appeal lack merit. The district court is affirmed.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Additional facts are presented as needed to address each issue raised on appeal
 
 
 [2]
 San Diego Naval Federal Credit Union v. Cumis Insurance Society, Inc., 162 Cal.App.3d 358 (1984)
 
 
 [3]
 See section L. of this memo concerning other jury disagreements which the appellants contend tainted the jury's deliberations
 
 
 [4]
 Noyer has failed to identify which exhibits this refers to
 
 
 [5]
 The term "Allen charge" came from the Supreme Court case Allen v. United States, 164 U.S. 492, 501 (1896). In Allen, the Court approved the use of a supplemental jury instruction to encourage the jury to reach a verdict when they had been unable to agree after a reasonable period of deliberation
 
 
 [6]
 Please refer to the Government's Brief, pp. 6-22, for a detailed review of the evidence presented regarding the Willow Ridge, Amgo, and Syndico litigation schemes